RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0003p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

DEANNA L. PUSKAS,

                *Plaintiff-Appellant*,

    *v*.

DELAWARE COUNTY, OHIO; ZACHARY SWICK; TROY
GIBSON; ROBERT SPRING; ROBERT BUTLER,

                *Defendants-Appellees*.

No. 22-3390

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:19-cv-02385—Sarah Daggett Morrison, District Judge.

Argued: December 6, 2022

Decided and Filed: January 5, 2023

Before: SUHRHEINRICH, CLAY, and DAVIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Carrie M. Varner, VARNER LAW OFFICE, Lewis Center, Ohio, for Appellant. Stephanie L. Schoolcraft, FISHEL, DOWNEY, ALBRECHT & RIEPENHOFF, LLP, New Albany, Ohio, for Appellees. **ON BRIEF:** Carrie M. Varner, VARNER LAW OFFICE, Lewis Center, Ohio, Pamella A. Lammon, LAMMON LAW OFFICE, Delaware, Ohio, for Appellant. Stephanie L. Schoolcraft, Daniel T. Downey, FISHEL, DOWNEY, ALBRECHT & RIEPENHOFF, LLP, New Albany, Ohio, for Appellees.

———————————

**OPINION**

———————————

SUHRHEINRICH, Circuit Judge.

This § 1983 action involves the shooting death of Brian Puskas after police officers responded to a 911 domestic disturbance call from Brian's wife, Plaintiff Deanna L. Puskas. The district court found that the defendant officers' actions were nonetheless reasonable under the circumstances. The camera footage confirms that conclusion. We therefore affirm the court's decision.

**I.**

The police body cameras tell much of the story here. Plaintiff's version of events fills in the rest for summary judgment purposes. *See Ashford v. Raby*, 951 F.3d 798, 800 (6th Cir. 2020) (citing *Scott v. Harris*, 550 U.S. 372, 378–80 (2007)).

Around 11:14 a.m. on June 6, 2018, Deanna called 911 from her home in Delaware County, Ohio, frantically claiming that her husband was threatening her and that she feared for her life. She told the 911 dispatcher that when Puskas came home from work he was "not normal," was tearing up the house, and was "threatening [her] with guns and knives." Deanna stated that Puskas had "never acted like this before," and explained that he had high blood pressure and depression and was on "new medication from the doctor" for "inflammatories." Deanna also indicated that there were lots of guns and knives in the house, and that Puskas "threatened to turn [her] into an ashtray." He also cut open a window screen after she locked him out and he was tossing items across the front yard. During the call, Deanna stated "I know what he's going to do, he's going to kill me."

Deanna ran to the neighbors' and hid behind a truck. She told the dispatcher that Puskas had "tremendous guns" in their house.

Several officers from the Delaware County Sheriff's Office and the Sunbury Police Department responded to an incident that dispatch "described as a domestic disturbance

involving firearms and knives." Defendant Deputy Zachary Swick was the first to arrive at 11:25 a.m., knowing that Puskas had weapons and was "not acting right." As he drove up, Swick observed stuff scattered across the lawn and Puskas holding a rifle. Puskas put the rifle down before Swick got out of the cruiser.

Swick told Puskas multiple times to put his hands up and to get on the ground. Puskas walked toward the house instead. He stopped near a tree close to the front door, picked up a bag, and pulled out a shotgun. Swick, who was about six feet from Puskas, fled for cover. His body camera fell off in the process. Puskas told Swick that he had "better run." From the safety of his vehicle, Swick reported to dispatch that Puskas had a shotgun and that there were other weapons in the yard. Puskas then dropped the shotgun.

From behind the cruiser, Swick reengaged with Puskas, asking "what's going on," and broaching the topic of Puskas's mental state. Officer Keith Brown from the Sunbury Police Department arrived next, at 11:30 a.m. He joined Swick behind Swick's cruiser. Brown also instructed Puskas to approach, and repeatedly beckoned to Puskas: "Let's talk about this, let's figure out what's going on"; "Come on partner, come out here and talk to me," "I understand you're having a rough day, why don't we talk about it?"; "I understand, I've got plenty of time—plenty of time"; and "Walk out this way partner, come on." Puskas did not obey. When the next officer, Sgt. Robert Curren, arrived at 11:32 a.m., he asked dispatch to send a negotiator. Dispatch notified Curren that a negotiator was on the way.

More officers arrived, including Defendants Sergeant Robert Spring and Deputy Troy Gibson. Gibson parked his cruiser on the west side of the residence (Swick's was on the east). Gibson, a canine officer for the Sheriff's Office, brought his canine partner, Cash, along. Cash is certified as a narcotics and patrol dog. Cash has been his canine partner since 2017. Relevant here is Delaware County Sheriff's Office Canine Policy, which states that "[t]he canine officer shall, if possible, verbally warn the suspect(s) that if they do not stop, the canine will be released." The County also has Response to Resistance and Less Lethal Force policies.

Gibson joined the other officers in trying to persuade Puskas to engage with them. Gibson told Puskas to "come to the sound of my voice, and we won't have any problems," and

"come out to us and you won't have any problems." Gibson was also preparing Cash "for an apprehension," repeatedly giving Cash the bite command. Puskas ignored Gibson's commands and continued to meander around the yard picking up various items off the ground, including a t-shirt. When told to drop the shirt, Puskas tossed it at the officers.

Gibson released Cash shortly thereafter. Deanna maintains that neither Spring nor Gibson warned Puskas to surrender or that the Cash would be released, and that Puskas did not turn and run until *after* Gibson discharged Cash. This is the basis of her first excessive force challenge. The officers maintain that they did not violate the Fourth Amendment because Gibson did not release Cash until *after* Puskas started to run towards the house.

The officers' differing accounts fuel the debate. Swick reported to investigating officers that Cash was not released until after Puskas had turned to run towards his residence. Spring recounted that Puskas "started to turn as to go back to the residence, [and] I advised Dep. Gibson to deploy his K-9 partner to apprehend the subject, which Dep. Gibson did."

On the other hand, Gibson, Cash's handler and therefore the so-called "trigger finger," supports Deanna's version of events:

> Q. Now what does he have in his hand? 3:26 we stopped it at. Can you see that he picked something up there?
>
> A. Yes.
>
> Q. Can you tell what that is?
>
> A. I believe that is the shirt.
>
>> [Plaintiff's Counsel]: Okay. And start at 3:26.
>>
>> (Video played back.)
>>
>> "You're going to get bit. You're going to get bit if you don't (inaudible)."
>>
>> "Stellen. Stellen."
>>
>> (Video playback stopped.)
>
> Q. So is the dog released at this point, 3:37?
>
> A. Obviously, yes.
>
> Q. Did you identify yourself at that point?
>
> A. No.

A. Okay.  So he threw the shirt right before you released.  Did he have a weapon in his hands?

. . . .

A. No.

. . . .

*Q. Okay.  So in response to you releasing the dog what did Mr. Puskas do?*

*A. He ran towards the house.*

Q. Okay.  And what happened next?

A. He continued running.  Cash ran next to him, did not engage him, and he circled around the—whatever, the tree landscaping north of the house . . . .

The camera footage further establishes that Cash initially targeted the t-shirt, not Puskas. Gibson refocused Cash on Puskas and followed Cash as Cash followed Puskas.  Swick and Spring followed behind Gibson and Cash.  All had their guns drawn.

Puskas pivoted away from the house and darted behind the tree near the front door. Gibson moved to the other side of the tree.  Cash still did not bite or apprehend Puskas.  Puskas then reached down and picked up a black pistol case.  Someone yelled, "he's got a pistol"; Swick yelled "drop it"; and Spring yelled "get off that."  Puskas pulled out a silver revolver, and the officers shot him at 11:38 a.m.  Puskas fell to the ground.

Swick kicked the pistol away and secured Puskas with handcuffs.  Puskas was transported to the hospital.  He died there.

Deanna, as administrator of Puskas's estate, sued Swick, Gibson, Spring, and Lt. Robert Buttler (aka the "Individual Defendants") under 42 U.S.C. § 1983, alleging that they used excessive force when they (1) deployed Cash and (2) shot Puskas.  Deanna alleged that Delaware County was liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for its lethal force and canine policies, and its failure to train or supervise the canine units.  She brought two state claims, as well.

The district court dismissed the claim against Buttler as time-barred and the *Monell* failure-to-train-or-supervise claim under Federal Rule of Civil Procedure 12(b)(6).  The court granted summary judgment to the Individual Defendants, concluding that the officers did not use

excessive force in either instance.  The court granted summary judgment on the *Monell* county policy claim.  The court dismissed the state law claims.

Deanna appeals.

**II.**

We review the grant of summary judgment de novo to determine whether there is "no genuine issue as to any material fact" such that the movant "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Palma v. Johns*, 27 F. 4th 419, 427 (6th Cir. 2022).

The doctrine of qualified immunity shields "government officials performing discretionary functions" from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Thus, a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (quoting *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011)).  Once invoked, the plaintiff must show that the defendant is *not* entitled to qualified immunity. *Id.* (citation omitted).  "That is, . . . when a defendant raises the defense of qualified immunity in a motion for summary judgment, the plaintiff must show that those facts and inferences would allow a reasonable juror to conclude that the defendant violated a clearly established constitutional right." *Id.* at 430–31 (citing *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020)).

**A.**

Deanna alleges that the officers violated Puskas's Fourth Amendment rights by first deploying Cash and then shooting Puskas.  A seizure is "unreasonable" under the Fourth Amendment if officers used excessive force. *Gambrel v. Knox Cnty.*, 25 F.4th 391, 400 (6th Cir. 2022) (citing *Graham v. Connor*, 490 U.S. 386, 394–97 (1989)).  In deciding whether the force used was excessive, we balance the government's interests in protecting others (including the police) and curbing crime against a suspect's right to not to be injured. *Id.*  Three factors are

particularly relevant: (1) "the severity of the crime at issue," (2) "whether the suspect pose[d] an immediate threat to the safety of the officers or others," and (3) "whether he [wa]s actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *Gambrel*, 25 F.4th at 400. We do so from the perspective of a reasonable officer at the scene, and not from "the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. And we "view excessive force claims in segments." *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (citations omitted).

**1.**

Deployment of a well-trained police dog is "[a]mong the various forms of force available to law enforcement, that is a comparatively measured application of force, which 'does not carry with it a substantial risk of causing death or serious bodily harm.'" *Jarvela v. Washtenaw Cnty.*, 40 F.4th 761, 764 (6th Cir. 2022) (dog bite) (quoting *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988)). But only if it's reasonable under the circumstances as measured by the *Graham* factors. *See Ashford*, 951 F.3d at 801–03; *Zuress v. City of Newark*, 815 F. App'x 1, 5–6 (6th Cir. 2020). The district court did just that, concluding:

> When Cash was released to apprehend Mr. Puskas, the Individual Defendants knew that: Mr. Puskas was suspected of domestic violence, had threatened his wife with "guns and knives," and had twice wielded firearms in the presence of Deputy Swick. Mr. Puskas had been acting erratically during his encounter with the Individual Defendants, and they saw that he had ready access to firearms in the yard. Mr. Puskas had refused to surrender and resisted attempts at apprehension even after he was warned that he would be bit if he refused to comply. When Mr. Puskas turned and ran toward his house where the Individual Defendants believed more guns were located, they reasonably believed that he posed an imminent threat to the personal safety of everyone on the scene.

Deanna attempts to chip away at the court's conclusion by disputing its treatment of the facts. First, she claims that the officers did not warn Puskas before releasing Cash—and Gibson's own testimony bolsters her argument. But the video establishes otherwise. Gibson said, "You're gonna get bit." Spring also clearly said, "You're gonna get bit if you don't . . . ." The word "comply" is fairly inaudible but still fairly inferable. *See Matthews v. Jones*, 35 F.3d 1046, 1048 (6th Cir. 1994) (officers "called out orders for [the suspect] to surrender" and "warned that the dog would be released if he did not" before releasing canine); *Robinette*,

854 F.2d at 911–12 (same). *Scott* dictates that the video controls. *See Scott*, 550 U.S. at 380–81; *see also Hayden v. Green*, 640 F.3d 150, 152 (6th Cir. 2011) (rejecting the plaintiff's allegations "to the extent they are clearly contradicted 'by a videotape capturing the events in question'" (quoting *Scott*, 550 U.S. at 378)).

Deanna also alleges that Puskas was not an imminent threat because he did not begin to flee until *after* the canine was deployed. Again, the camera footage tells a different story, from two perspectives, Gibson's and Brown's body cameras. Admittedly, the videos are not of the highest resolution and some scenes are blurry, but the parties' movements are discernible. Brown's body camera provides the clearer picture. It shows Puskas, after tossing the shirt in the officers' direction, back up, turn and run towards the house, despite the officers' warnings that he was "gonna get bit."

Gibson's body camera's depiction mirrors Brown's. Gibson repeatedly asked Puskas to "come to the sound of my voice," "come out to us and you won't get hurt," and "don't pick anything up." Puskas nonetheless bent down, picked up the shirt, and threw it towards the officers. Both Gibson and Spring warned Puskas that he was going to get bit. Gibson held Cash tightly by the collar. Although not pellucid, the video shows Gibson release his grip on Cash *after* Puskas had turned and started to run towards the house. Therefore, the inconsistent accounts by the officers, including the dog's handler, do not create a genuine issue of material fact for trial. *See Scott*, 550 U.S. at 380–81; *Hayden*, 640 F.3d at 154.

Deanna also contends that Cash was "a poorly trained dog that attacked suspects without warning or command," *Ashford*, 951 F.3d at 803, because he was not "fully mature" (eighteen months old at the time of the incident rather than two years of age) and had never successfully apprehended an individual. But the record establishes that Gibson and Cash were an OPOTA (Ohio Police Officer Training Academy) canine team with "at least 240 hours of training" that covered all aspects of dual-purpose police canine training, including apprehensions. And Gibson performed monthly maintenance training with Cash. Although Cash had never apprehended a fleeing suspect before Puskas, that is because June 6, 2018, was his first deployment. Gibson testified that Cash never failed to bite or engage a suspect when commanded during training

exercises. The record simply does not support the assertion that Cash was a "poorly trained dog." *Ashford*, 951 F.3d at 803.

Deanna posits that Swick or Gibson should have tased Puskas instead of releasing Cash. She argues that Swick could have tased Puskas when he was within six feet of Puskas (a taser can fire up to 21 feet). Furthermore, the taser policy in effect encouraged its use. Maybe so. But "the Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances." *Davenport v. Causey*, 521 F.3d 544, 552 (6th Cir. 2008) (cleaned up); *Ashford*, 951 F.3d at 801 (same). Thus, whether using a taser would have been a better technique is not a question that is before us; we are asked only whether the techniques used were reasonable under the circumstances. Swick testified that he decided not to deploy the taser because there were other, lethal weapons in the yard. And, as noted above, deploying Cash was an accepted police tactic. Furthermore, the video clearly shows that the defendant officers were trying to deescalate the situation by calmly entreating Puskas to come to them. In short, the officers' decisions here are paradigmatic judgment calls, which we do not second guess. *See Graham*, 490 U.S. at 396. Thus, as the district court noted, "the decision to forgo tasering for the possibility of nonviolent resolution was far from 'plainly incompetent.'" We therefore hold that, under the circumstances the officers faced here, the decision to release Cash did not violate the Constitution.

**2.**

"When an officer uses *deadly* force, that force is unreasonable unless 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Palma*, 27 F.4th at 432 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). The officers' use of deadly force is also examined for objective reasonableness, using the *Graham* factors. *Graham*, 490 U.S. at 396–97. However, the threat of immediate harm is a "minimum requirement for the use of deadly force." *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005); *see also Palma*, 27 F.4th at 432.

The first (severity of the crime) and third (resisting arrest or fleeing) *Graham* factors support the use of deadly force. Again, the crime was severe—the officers knew that Puskas had

threatened Deanna with weapons and had access to them. Puskas repeatedly disobeyed the officers' orders to come to them and to leave everything on the ground, and he attempted to flee to his house, where more weapons were stored.

What Puskas did next, made the danger to the officers imminent (the second *Graham* factor). The video footage confirms that as Puskas was heading towards the house, he pivoted towards the tree, picked up a black case, pulled out a pistol (or revolver), and appeared to draw the gun. At this point, the officers, who were in pursuit of Puskas, became easy targets—and Puskas's prior behavior could reasonably be perceived as raising those odds. *See, e.g.*, *Thornton v. City of Columbus*, 727 F. App'x 829, 837 (6th Cir. 2018) (deadly force reasonable where suspect was within 15 feet holding a shotgun (not pointed at the officers) after he failed to comply with the officers' order to drop the weapon); *Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017) (deadly force reasonable where individual suspected of burglary ran towards the officer "with a gun"); *Pollard v. City of Columbus*, 780 F.3d 395, 403–04 (6th Cir. 2015) (deadly force reasonable where uncooperative suspect held his hands in a shooting posture and pointed at the officers after a high-speed chase); *Simmonds v. Genesee Cnty.*, 682 F.3d 438, 445 (6th Cir. 2012) (deadly force reasonable where suspect brandished a silver object, yelling "I have a gun" after threatening to kill others and fleeing from police); *Livermore*, 476 F.3d at 404–05 (deadly force reasonable where suspect helped cause a standoff and rather than surrendering as agreed, exited his burning residence carrying a rifle). *See generally Gambrel*, 25 F.4th at 405–06 (stating that "[i]n countless cases applying [the *Garner* deadly force] test, we have found that officers had probable cause that made their shooting lawful when they could reasonably conclude that a suspect might fire a gun at them") (collecting cases).

Again, as the district court put it:

The Individual Defendants were dispatched to the scene of a domestic violence call after Mr. Puskas threatened his wife with guns and knives. In the moments leading to the decision to use lethal force, the Individual Defendants knew that Mr. Puskas was acting erratically and had twice wielded firearms in the presence of Deputy Swick. They also knew that there were multiple firearms in the yard and believed there to be more inside the house. Mr. Puskas refused to surrender and instead ran toward his house. With Cash and the Individual Defendants in close pursuit, Mr. Puskas stopped to retrieve a gun case, unzipped it, and drew a

silver revolver. At that moment, the Individual Defendants feared for the lives of everyone on [the] scene . . . .

In other words, the "tense, uncertain, and rapidly evolving" circumstances justified the shooting. *Graham*, 490 U.S. at 397. We do not second guess such split-second decisions. *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam).

Next, Deanna contends that because Puskas did not "brandish" the silver revolver at the officers, their reaction was unreasonable. It's true that officers cannot shoot a suspect merely because he has a gun. *Campbell*, 47 F.4th at 480; *Thomas*, 854 F.3d at 366. But they do not necessarily need to wait until he points it at them. *Thornton*, 727 F. App'x at 838; *see also Wilkerson v. City of Akron*, 906 F.3d 477, 482–83 (6th Cir. 2018) (officers who shot fleeing suspect could have reasonably believed that suspect could turn and fire upon them). Here the officers had other factors that flipped the switch from "unreasonable" to "reasonable." *See Thomas*, 854 F.3d at 366 ("Whether a suspect has a weapon constitutes just one consideration in assessing the totality of the circumstances."). As the district court noted, Puskas had just threatened to shoot his wife, had the means to carry the threat out, repeatedly disobeyed the officers for over twenty minutes, and was acting erratically. Clearly, there were "additional indicia that the safety of the officer[s] . . . [wa]s at risk." *Campbell*, 47 F.4th at 480; *cf. Bouggess v. Mattingly*, 482 F.3d 886, 890–92 (6th Cir. 2017) (holding that officer who shot suspect for resisting arrest and fleeing was not entitled to qualified immunity where there was no evidence that the suspect had a gun).

Deanna also argues that Cash's deployment precipitated the deadly shooting, because it caused Puskas to turn and flee for his safety and pick up a gun case (with a gun inside) along the way. But that argument contradicts the video. In any event, we analyze the dual uses of force separately and "measure the reasonableness of the use of deadly force at a particular time based on an 'objective assessment of the danger a suspect pose at that moment.'" *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (quoting *Bouggess*, 482 F.3d at 889); *Bouggess*, 482 F.3d at 890 (stating that "[t]he relevant time . . . is the moment immediately preceding the shooting"). "We do not scrutinize whether it was reasonable for the officer 'to create the circumstances.'" *Thomas*, 854 F.3d at 365 (citing *Livermore*, 476 F.3d at 406). Put another way, "[a]

different Fourth Amendment violation cannot transform a later, reasonable use of force into an unreasonable seizure." *Thornton*, 727 F. App'x at 837 (quoting *Los Angeles v. Mendez*, — U.S. —, 137 S. Ct. 1539, 1544 (2017)); *Goodwin v. Richland Cnty.*, 832 F. App'x 354, 358 (6th Cir. 2020).

Nor can it be said that Cash's deployment proximately caused the shooting, because it was not foreseeable that Puskas would stop to pick up a gun while fleeing from Cash. *See Mendez*, 137 S. Ct. at 1548–49 (recognizing proximate cause theory and holding that courts must find some direct relation between the injury asserted and the alleged relevant constitutional violation).

Deanna advances another argument for the first time on appeal. Guided by our decision in *Palma*, she contends that because the officers knew or should have known that Puskas was suffering from mental illness, they should have attempted to deescalate the situation before resorting to deadly force. Because "the *Graham* factors do not easily map onto cases" where officers are responding "to a medical or mental health emergency" courts must consider additional factors. *Palma*, 27 F.4th at 429. These include whether (1) "the person was experiencing a mental health or medical emergency, and whether that emergency created 'an immediate threat of serious harm' to themselves or others"; (2) "some degree of force [was] reasonably necessary to ameliorate the immediate threat"; and (3) "the force used [was] more than reasonably necessary under the circumstances." *Id.* (quoting *Estate of Hill by Hill v. Miracle*, 853 F.3d 306, 314 (6th Cir. 2017)); *see also Roell v. Hamilton Cnty.*, 870 F.3d 471, 482 (6th Cir. 2017) (holding that officers required to factor in a person's diminished mental capacity before using force to restrain him).

Deanna did not make that argument in the district court at summary judgment (and she could have). *See Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 775 (6th Cir. 2004) (noting that "a suspect's apparent mental state" is a fact that should be considered in weighing an excessive force claim). So, we do not consider it on appeal. *See Greco v. Livingston Cnty.*, 774 F.3d 1061, 1064 (6th Cir. 2014) (stating that "the forfeiture rule . . . tells us to correct errors raised and addressed below, not to entertain new claims raised for the first time on appeal"); *Armstrong v. City of Melvindale*, 432 F.3d 695, 699–700 (6th Cir. 2006) ("Although both parties

briefed *this* court on the issue, the failure to present an issue to the district court forfeits the right to have the argument addressed on appeal."); *Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745, 749 (6th Cir. 2005) (holding that the plaintiff could not raise a different argument on appeal). *See generally Palma*, 27 F.4th at 454 (Readler, J., dissenting) (citing *Greco*, *Armstrong*, and *Barner*).

Even if we did—this case is not like *Palma*. In *Palma*, the defendant officer responded to a family dispute over a TV remote. *Palma*, 27 F.4th at 424 (majority op.). The 911 dispatcher told him that the suspect, Vincent Palma, had mental health issues. *Id.* Palma was nonresponsive and noncompliant to the officer's commands and kept walking towards him. *Id.* at 425. The officer tased Palma and then shot him. We affirmed the denial of qualified immunity. Because the officer knew Palma was mentally ill, he was required to consider Palma's mental state before using force against him. *Id.* at 436–37. Thus, the officer acted unreasonably in shooting Palma because he "was not responding to an ongoing crime" and Palma "never physically resisted arrest or tried to flee." *Id.* at 428–29, 437.

Here, the officers were responding to a *live* crime scene, with a noncompliant, erratic, and most important, *armed* suspect. As the *Palma* majority recognized, "an officer is not absolutely barred from using lethal force on mentally ill individuals." *Id.* at 437 (stating that "only in extreme cases have we found that an officer reasonably used lethal force against a mentally ill person"). Given these additional factors, the officers' actions were not unreasonable. *Id.* (collecting cases where officers reasonably "used lethal force against a mentally ill person who was *armed* and *threatening* officers"). That is why Deanna's argument that the officers should have waited for the negotiator is also a nonstarter—Puskas had a gun in his hand and the situation was "tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397.

*Gambrel* is also a different case. There, officers fatally shot a mentally unstable, unarmed individual when he got up from the ground after being beaten by the defendant officers and took a step towards them. 25 F.4th at 406. But bystanders testified that the officers had "brutally beaten a nonfighting" plaintiff that they could have handcuffed while he was still down. *Id.* Because the latter version, if true, would have been unreasonable, we denied summary judgment. *Id.* at 407. *Studdard* doesn't advance the ball for Deanna either. In that case the

defendant officers shot a mentally unstable individual after he raised a knife to his throat and began moving forward towards them in a swaying motion. *Studdard v. Shelby Cnty.*, 934 F.3d 478, 480–81 (6th Cir. 2019). He too disobeyed the officers' orders to drop the weapon. *Id.* at 481. Notwithstanding, we held that the defendants' actions "did not justify lethal force" because the individual was a danger only to himself and did not present an immediate risk of harm to others. *Id.* We therefore affirmed the denial of qualified immunity on summary judgment. *Id.* at 483.

Although Spring and Swick both testified that they did not know that Puskas had mental health issues it is obvious from their comments and commands that Defendants were aware of, *and sensitive to*, Puskas's precarious mental state. At a minimum, they felt that his behavior was "abnormal" as defined by the Delaware County's standard operating policy. Puskas himself told Swick that he was "just not having a good day." Indeed, Puskas's odd behavior made it clear that he was "off." But, as stated above, this does not transform the officers' behavior from "reasonable" to "unreasonable" under the circumstances presented here.[1]

### 3.

Because we conclude that the officers did not violate Puskas's constitutional rights, there is no need to address the clearly established prong of the qualified immunity analysis.[2]

### B.

Deanna also challenges the district court's dismissal of her *Monell* failure-to-train-or-supervise claim and grant of summary judgment as to her county policies claim. An underlying constitutional violation is the *sine qua non* of municipal liability, which requires that the

---

[1]The fact that the Sheriff's Office stopped Puskas three days earlier for speeding and driving erratically, without more, does not show that the department was aware of Puskas's mental health issues. Charm Johnson, the officer that stopped him for speeding, stated that he did not think that Puskas was experiencing a mental health crisis. The police report states simply that Puskas received a "warning for speeding."

[2]We also do not need to address two new theories of liability Deanna presented in her summary judgment motion that the district court refused to consider as well as other issues presented in her appellate brief because she failed to develop them on appeal. *See Geboy v. Brigano,* 489 F.3d 752, 767 (6th Cir. 2007) (issues "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" (citation omitted)).

constitutional violation was caused by a municipal policy or custom.  *Monell*, 436 U.S. at 694; *Baker v. City of Trenton*, 936 F.3d 523, 535 (6th Cir. 2019); *Thomas*, 854 F.3d at 367 ("No constitutional violation means no municipal liability.").  As explained above, Deanna has not established any constitutional violation.  The district court properly granted summary judgment to the County.

**III.**

We **AFFIRM**.