NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0077n.06

No. 22-5568

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

JOHN SAWYER, as Next of Kin of Jack Sawyer, deceased,

      Plaintiff-Appellant,

v.

CITY OF SODDY DAISY, TENNESSEE; MATTHEW THOMAS, ERIC JENKINS, and ERIC HINDMON, in their individual and official capacities,

      Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

FILED
Feb 07, 2023
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE

OPINION

___

BEFORE: GRIFFIN, WHITE, and THAPAR, Circuit Judges.

GRIFFIN, Circuit Judge.

Jack Sawyer, who suffered from dementia, lived with his girlfriend. One night, he pointed a gun at her from close range, prompting her to flee and call the police. She asked them to check on him, explaining that she had previously removed bullets from the gun. Three officers went to the house to check on Jack, and two of them found him in his bedroom. When they entered the room, Jack stood up, pointed the gun at them, and did not drop it when told to do so. One of the officers shot and killed Jack. The estate sued defendants, asserting various federal and state-law claims arising out of Jack's death. The district court granted summary judgment in favor of defendants, concluding that the officer's use of force was reasonable under the circumstances. We affirm.

I.

Jack and his girlfriend, Patti Grimm, lived together in Grimm's house. He had dementia and Alzheimer's. To protect him and others, Grimm removed all the guns from the home save a pistol that she had unloaded. After doing so, Grimm did not see the pistol again until the night of Jack's death, about two months later.

On September 19, 2019, Jack grew frustrated with the TV and pointed the gun at Grimm from about three feet away. She fled to her daughter and son-in-law's house. Once there, Grimm called the police and asked them to perform a wellness check on him.

Defendant police officers Eric Jenkins, Matthew Thomas, and Eric Hindmon responded. Grimm and her son-in-law informed the officers of Jack's diagnoses, his pointing of the gun, Grimm's fear of returning home, and the removal of the guns and bullets. When asked if Grimm removed all the bullets from the gun, Grimm's son-in-law said "she says" with voice inflection that made him sound skeptical. So the officers proceeded to Grimm's house.

The officers attempted to contact Jack at the front of the house and by having dispatch call him. After a few minutes without response, Grimm gave them access to her house. They entered with their guns drawn while calling out Jack's name and announcing themselves as police.

During their sweep of the house, Officers Thomas and Jenkins approached a closed door. Thomas opened the door, revealing a short hallway leading to Jack's bed. Jack was sitting on his bed with his back to Thomas and Jenkins in a dimly lit room. Without identifying himself as a police officer, Thomas approached the bed and again called Jack's name. Jack responded by standing up, turning to his right towards the officers, and raising his right hand holding a gun from the left of his lap up and across his body in the officers' direction. One of the officers shouted "put it down" as Jack stood up, but Jack did not drop the gun. Jenkins fatally shot Jack eight

seconds after Thomas entered the bedroom and only two seconds after Jack stood up.  Jack was found wearing a sleep mask, and his pistol was cocked, but unloaded.

On behalf of Jack's estate, his son, John Sawyer, sued the officers and the City of Soddy Daisy, alleging various Fourth Amendment and Tennessee state-law claims.  The district court granted summary judgment in favor of all defendants, concluding they were entitled to qualified immunity (and immunity under Tennessee law) because Officer Jenkins acted reasonably when he shot Jack, and the estate's claims against the other defendants all relied on Jenkins using excessive force.  Plaintiff appeals, addressing only his Fourth Amendment claims.

II.

The dispositive issue in this case is whether Officer Jenkins is entitled to qualified immunity regarding the Fourth Amendment unreasonable seizure claim, as all of the estate's other claims flow from that underlying alleged constitutional violation.  Qualified immunity shields public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982).  It is not a "mere defense to liability"; the doctrine provides "*immunity from suit*." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  This immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," "protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted). A "plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011).  With this burden in mind, "a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that:  (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Williams v. Maurer*,

9 F.4th 416, 430 (6th Cir. 2021) (internal quotation marks omitted). The district court concluded plaintiff failed to demonstrate a violation of a constitutional right, and we review that decision de novo. *Sutton v. Metro. Gov't of Nashville & Davidson Cnty.*, 700 F.3d 865, 871 (6th Cir. 2012).

"[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1983). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). "Police officers routinely face 'tense, uncertain, and rapidly evolving' situations that force split-second judgments about the degree of force required"; we account for this by "evaluat[ing] the force used through the eyes of a reasonable officer at the scene, not with 'the 20/20 vision of hindsight.'" *Reich v. City of Elizabethtown*, 945 F.3d 968, 978 (6th Cir. 2019) (quoting *Graham*, 490 U.S. at 396–97).

*Garner*'s "probable cause" standard governs whether an officer who uses deadly force violates the Fourth Amendment—an officer acts reasonably when deploying deadly force if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." 471 U.S. at 11. This objective test requires courts to judge the use of force from the perspective of a reasonable officer on the scene, "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. And we must apply a segmented approach to the analysis: we evaluate the "split-second judgments made immediately before the officer used allegedly excessive force." *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007) (internal quotation marks omitted). Discarded from this analytical overlay, then, is any "poor planning or bad tactics that

might have created the circumstances that led to the use of force." *Reich*, 945 F.3d at 978 (internal quotation marks omitted). Additionally, "[t]he Fourth Amendment only requires officers to act reasonably on the information they have; it does not require them to perceive a situation accurately." *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017).

The Supreme Court has identified three non-exclusive factors that lower courts should consider in determining the reasonableness of force used: "(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officers or others; and [(3)] whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Livermore*, 476 F.3d at 404. Here, the claim turns on the threat factor.

The threat factor is "a minimum requirement for the use of deadly force," meaning deadly force "may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm." *Untalan v. City of Lorain,* 430 F.3d 312, 314 (6th Cir. 2005). Because the "mere possession of a weapon is not sufficient to justify the use of deadly force," we require "additional indicia that the safety of the officer or others is at risk." *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F. 4th 468, 480 (6th Cir. 2022). This "often turn[s] on whether an armed suspect pointed her weapon at another person." *Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020). We recently summarized our caselaw as follows: "[W]e have found that officers had the probable cause that made their shooting lawful when they could reasonably conclude that a suspect might fire a gun at them or use another dangerous weapon against them (even if they turned out to be wrong)." *Gambrel v. Knox Cnty.*, 25 F.4th 391, 405–06 (6th Cir. 2022) (collecting cases).

The estate admits that Jack had a gun when he was shot, and the officers' bodycams show Jack pointed the gun—despite instructions to drop it—at Thomas and Jenkins immediately before he was shot. When an individual "stops following officer commands and instead grabs a readily

accessible firearm, an officer need not wait for the suspect to open fire on him before the officer may fire back." *Jordan v. Howard*, 987 F.3d 537, 544 (6th Cir. 2021) (alterations and internal quotation marks omitted). Jenkins thus had "probable cause to believe that [Jack] pose[d] a threat of serious physical harm, either to" Jenkins or Thomas. *Garner*, 471 U.S. at 11.

That the gun was ultimately found to have been unloaded is of no moment. Jenkins was not required to risk his life and Thomas's life on the untested assumption that Jack had not reloaded the gun in the two months since Grimm unloaded it, nor was he presented with an opportunity to confirm whether Jack had done so. Indeed, Officer Jenkins knew of Grimm's son-in-law's skeptical response to Grimm's statement about unloading the gun, as well as Grimm's reaction to Jack's pointing the gun at her, suggesting she too thought the gun posed a serious threat. It was not unreasonable for Jenkins to view the gun in the same way, even if it turned out afterwards that he was wrong. *See Gambrel*, 25 F.4th at 405 ("In countless cases applying this test, we have found that officers had the probable cause that made their shooting lawful when they could reasonably conclude that a suspect might fire a gun at them or use another dangerous weapon against them (even if they turned out to be wrong).") (collecting cases); *see also Thomas*, 854 F.3d at 365–67 (officer did not violate decedent's constitutional rights by using deadly force against decedent running towards the officer while holding an unloaded gun).

Nor does Jack's mental-health status render Jenkins' use of force unreasonable here. The *Graham* factors do not readily apply to cases involving mental-health emergencies so we consider additional factors in such situations. *Puskas v. Delaware Cnty.*, 56 F.4th 1088, 1097–98 (6th Cir. 2023); *Palma v. Johns*, 27 F.4th 419, 429 (6th Cir. 2022). These additional factors include "(1) whether the person was experiencing a mental health or medical emergency, and whether that emergency created an immediate threat of serious harm to themselves or others; (2) whether some

degree of force was reasonably necessary to ameliorate the immediate threat; and (3) whether the force used was more than reasonably necessary under the circumstances." *Palma*, 27 F.4th at 429 (alterations and internal quotation marks omitted). Viewing the evidence in the light most favorable to the Estate, Jack was experiencing a mental-health emergency because of his dementia and Alzheimer's diagnoses, as well as his unusual actions leading to him aiming the gun at Grimm. That said, the second and third *Palma* factors support Jenkins's use of force because Jack pointed a gun at Jenkins and Thomas from only a few feet away. This action posed an immediate threat that nondeadly force might not have prevented. It is true that deadly force is permissible against mentally ill individuals "only in extreme cases." *Id.* at 437. But Jenkins was confronted with an extreme situation. He was searching a house for an individual who had pointed a gun at his girlfriend. Then, when Jenkins entered the bedroom, Jack stood up, turned, and pointed his gun at Jenkins and Thomas. The situation was undoubtedly "tense, uncertain, and rapidly evolving" in the moments after Thomas and Jenkins entered Jack's bedroom. *See Puskas*, 56 F.4th at 1098 (citation omitted). In the end, Jenkins's use of deadly force was reasonable regardless of Jack's mental health because Jack pointed a gun at Jenkins and Thomas from mere feet away.

Finally, plaintiff asserts that the officers did not obtain true consent to enter Grimm's house because they did not tell Grimm that they intended to arrest Jack. Even if this were true and established a Fourth Amendment violation, it cannot factor into the deadly-force analysis. *See id.* at 1097. Whether the use of deadly force was reasonable is "based on an objective assessment of the danger a suspect pose[d] at that moment," so an officer can still be entitled to qualified immunity even if he "create[d] the circumstances" under which he used deadly force. *Id.* (internal quotation marks omitted). Accordingly, whether Jenkins violated the Fourth Amendment when entering the home plays no part in our analysis.

Given this, the district court correctly concluded that Officer Jenkins did not use excessive force in violation of the Fourth Amendment. Because the district court correctly held that Jenkins did not violate Jack's constitutional rights, it also properly granted summary judgment in favor of Thomas and Hindmon for not stopping the use of force and in favor of the City on the Estate's *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978) claim. *See, e.g.*, *Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 490 (6th Cir. 2020); *Thomas*, 854 F.3d at 367.

III.

For these reasons, we affirm the judgment of the district court.