RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0071p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────────

KEYONTE ASHFORD, SR.,

                    *Plaintiff-Appellant*,

      *v.*

MICHAEL RABY,

                    *Defendant-Appellee.*

No. 19-1677

─────────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:18-cv-10813—George Caram Steeh, III, District Judge.

Decided and Filed: March 5, 2020

Before: MERRITT, THAPAR, and LARSEN, Circuit Judges.

─────────────────

**COUNSEL**

**ON BRIEF:** Matthew S. Kolodziejski, LAW OFFICE OF MATTHEW S. KOLODZIEJSKI, PLLC, Troy, Michigan, for Appellant. T. Joseph Seward, Kali M. L. Henderson, SEWARD HENDERSON PLLC, Royal Oak, Michigan, for Appellee.

─────────────────

**OPINION**

─────────────────

THAPAR, Circuit Judge. This case comes down to a matter of perspective. After a car chase, law enforcement used a police dog to remove a driver from his vehicle. From the driver's perspective, this was an unprovoked attack on a cooperating suspect. From the officer's perspective, it was the best way to gain control of the situation. The district court granted the officer qualified immunity. Because existing law did not clearly establish that the officer's perspective was unreasonable, we affirm.

I.

In describing what happened, we rely mainly on undisputed video footage from police dashboard cameras on the scene. We adopt the plaintiff's version of any facts not caught on film. *See Scott v. Harris*, 550 U.S. 372, 378–80 (2007).

Keyonte Ashford was driving on the highway after having too much to drink. A police officer noticed him speeding at over 100 miles per hour and changing lanes without a turn signal. The officer sped up to follow and soon turned on his lights to indicate that Ashford should pull over. This sent Ashford into a panic attack. Instead of promptly pulling over, he decided to drive somewhere he felt more comfortable stopping (a Walgreens by his home).

Of course, the officer knew nothing about what Ashford was feeling. He knew only what he could see from his perspective: someone had been driving erratically at over 100 mph and was now refusing to pull over. The officer tailed Ashford for more than two minutes while radioing in the details of the chase. Eventually, two backup cruisers arrived. The three police cars then surrounded Ashford and forced him to stop.

At that point, two officers got out of their cars and told Ashford to show his hands. He complied, thrusting his hands out the window. The officers then told Ashford twice to turn his engine off. Ashford did not comply; instead, he simply thrust his hands further out the window.

That's when Officer Michael Raby and his trained police dog Ruger arrived on the scene. From then on, Raby took the leading role in the officers' interactions with Ashford. While the other officers told Ashford to keep his hands up, Raby slowly approached Ashford's door and tried to open it. Finding it locked, Raby told Ashford to unlock it, then reached through the window, unlocked the door himself, and pulled it open. With the door open, the officers started telling Ashford to step out of the vehicle.

But he didn't come out. Why not? Because Ashford's SUV was still in drive and his foot on the brake was the only thing stopping it from lurching forward into a police cruiser. Ashford was afraid that if that happened, the officers would think he was using his vehicle as a weapon and would shoot him. Unfortunately, Ashford did not think he could turn the vehicle off

either.  Why?  Because that would have required Ashford to retract a hand into the passenger compartment.  And he was terrified that if he did that, the officers would think he was reaching for a weapon and would shoot him.

Ashford tried to explain this dilemma to the officers.  He also had an idea for a solution: although *he* was unwilling to leave the vehicle while it was in drive, *the officers* were free to reach into the vehicle and park or shut it down themselves (at which point he would gladly get out).  But it's unclear whether the officers heard this suggestion amid the noise.

Even if they did, they weren't interested—they just kept telling Ashford to step out of the car.  They also warned him that if he didn't, Raby would send the dog to apprehend him.  After twenty seconds of Ashford's refusal to leave the vehicle (and one final warning about the dog), Raby commanded Ruger to attack.

Ruger made two lunges but failed to lock on to Ashford either time.  After the second attempt, Raby stepped in to help, grabbing Ashford's left arm and lowering it for Ruger to bite.  Raby and Ruger then pulled Ashford out of the driver's seat and onto the road, where the officers completed the arrest.  Afterward, the officers took Ashford to the hospital.  He was treated for three puncture wounds and several more superficial injuries to his left forearm.

Ashford later sued Raby under 42 U.S.C. § 1983, claiming that the canine seizure violated his Fourth Amendment right against excessive force.  But the district court entered summary judgment for Raby based on qualified immunity.  The court found that Raby's use of force was legal and (even if it wasn't) did not violate clearly established law.  This appeal followed.

## II.

Ashford faces an uphill battle.  To be constitutional under the Fourth Amendment, Raby's use of force only needed to be reasonable under the circumstances.  *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).  Reasonable does not mean vindicated by hindsight.  *Id.* at 396. Nor does it mean only the best technique available at the time.  *Dickerson v. McClellan*, 101 F.3d 1151, 1160 (6th Cir. 1996).  In police work, officers usually face a range of acceptable

options, not a single, rigid right answer. The reasonableness standard thus "contains a built-in measure of deference to the officer's on-the-spot judgment." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).

In damages suits like this one, this built-in deference becomes "double deference." *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015). That's because "the substantive constitutional standard protects [the officer's] reasonable factual mistakes and qualified immunity protects him from liability where he reasonably misjudged the legal standard." *Id.* (cleaned up); *see Saucier v. Katz*, 533 U.S. 194, 205 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

Thus, even if Raby's use of force *was* unreasonable, Ashford still can't recover unless its unreasonableness was "clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (cleaned up). That's a tough standard. How tough? Well, Ashford must show that "then-existing precedent" put the illegality of Raby's conduct "beyond debate." *Id.* (cleaned up). The law must have been so clear that *every* reasonable officer in Raby's shoes would have recognized that the force used was excessive—and not just in the abstract but in the *precise* situation Raby was facing. *Id.* at 589–90; *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam). That means that Ashford must point to precedent finding a Fourth Amendment violation in similar circumstances or (failing that) show that this is "the rare 'obvious case'" in which no precedent is needed. *Wesby*, 138 S. Ct. at 590 (cleaned up).

So can Ashford show that Raby violated his clearly established rights? He cannot. To see why not, consider three questions: (1) Was it reasonable for Raby to use force to remove Ashford from his vehicle? (2) If so, was it reasonable to deploy Ruger to perform the seizure? (3) Finally, did Raby reasonably manage the dog during the seizure?

A.

*Initiating Force: Removing Ashford from the Vehicle.* Raby's decision to use force to remove Ashford from the SUV was reasonable. Think about it from the officers' perspective: Ashford had just led law enforcement on a two-and-a-half-minute highway chase and was now refusing to get out of his vehicle. Surely, a reasonable officer would believe it appropriate to

remove Ashford from his vehicle at that point. Indeed, this court has recognized that and approved the seizure of a runaway driver under similar circumstances. *See Dunn v. Matatall*, 549 F.3d 348, 354–55 (6th Cir. 2008).

True, Ashford had his hands up and was not making any aggressive moves. But that does not change two critical facts: (1) the officers could not control the scene with Ashford in the vehicle and (2) Ashford was refusing to exit the vehicle. If he was unwilling to budge on his own, the officers had little choice but to remove him.

Also true, Ashford had a reason for not wanting to move: the vehicle was in drive and he was unable to turn it off while keeping his hands up. Under the circumstances, his reluctance to act is understandable. We also understand why inviting the officers to park the vehicle themselves seemed like the best idea at the time.

But we must consider what was reasonable from the *officer's* perspective, not the suspect's. *Graham*, 490 U.S. at 396. Here, even if Raby heard Ashford's explanations, he could not peer into Ashford's heart to assess his good faith. All Raby knew about the suspect in front of him was that he had been driving erratically and at excessive speeds, had refused a lawful signal to pull over, had stopped only when forced to, and even then had left his vehicle in drive for some unknown reason. Now he was asking Raby or another officer to enter the SUV, park it, and take the keys from the ignition.

Consider the steps involved in that proposal. To reach the gear shift and keys, an officer would have had to either lean over Ashford from the driver's side or climb into the vehicle on the passenger side. Next, for the officer to *move* the gear shift and remove the keys, Ashford would have had to keep his foot on the brake the whole time.

Now consider the risks involved. What if Ashford attacked the officer when he came within range (maybe to seize his weapon, or maybe to use him as a human shield)? What if someone else was in the back of the SUV and *that* person attacked the officer? Or what if Ashford (seeing a potential last-ditch opportunity to escape) took his foot off the brake and floored the gas pedal instead? The resulting movement would have jolted the officer entering the vehicle, taken the officers outside the vehicle by surprise, and endangered everyone.

In short, Ashford's idea only made sense if the officers trusted him. And from what Raby knew about Ashford, it was reasonable to think he hadn't earned the officers' trust. That left only one option: removing Ashford from the vehicle by force. Under the circumstances, that option was reasonable.

B.

*The Method: Deploying Ruger.* Granting that it was reasonable to seize Ashford, was it reasonable to seize him *using a police dog*? Or was sending an 80-pound Dutch Shepherd to drag him from his car simply too disproportionate?

In answering these questions, it's helpful to ask: what was the alternative? To be sure, showing a potential gentler alternative is not enough (by itself) to make a use of force unreasonable. *See Dickerson*, 101 F.3d at 1160; *Lyons v. City of Xenia*, 417 F.3d 565, 576 (6th Cir. 2005) (opinion of Sutton, J.). But that doesn't mean that the absence of superior alternatives is irrelevant to the inquiry. Common sense says that a court should not condemn police officers' on-the-ground actions without some idea of what the officers should have done instead. *See Graham*, 490 U.S. at 396–97.

Here, Ashford has offered no suggestion (not counting his impractical you-grab-the-keys idea) for how Raby *should* have removed him from the vehicle. The simplest dog-free alternative would have been for one or more officers to pull Ashford from the vehicle (*i.e.*, exactly what happened, just minus Ruger). But while this would have spared Ashford some painful bite wounds, it would also have placed the officers at greater risk. After all, grabbing Ashford meant attaching oneself (at least briefly) to the still-running SUV. As Raby put it in his deposition: "All [Ashford] had to do was step on the gas and you have a 6,000-pound vehicle that you're [ ] next to and possibly getting drug by[.]" R. 18-4, Pg. ID 353. Given this risk, it was reasonable to entrust the first stage of the seizure to Ruger rather than a human being.

At the very least, Raby's choice to deploy the dog was not "plainly incompetent" and did not violate clearly established law. *Wesby*, 138 S. Ct. at 589 (cleaned up). Ashford can point to no binding authority holding that deploying a police dog in similar circumstances violated the Fourth Amendment. *See id.* at 590. Indeed, most of this circuit's excessive-force precedents

involving police dogs find no violation at all.  *See Dunigan v. Noble*, 390 F.3d 486, 492–93 (6th Cir. 2004); *Matthews v. Jones*, 35 F.3d 1046, 1051–52 (6th Cir. 1994); *Robinette v. Barnes*, 854 F.2d 909, 913–14 (6th Cir. 1988).

The only exception involved a poorly trained dog that attacked suspects without warning or command.  *Campbell v. City of Springboro*, 700 F.3d 779, 789 (6th Cir. 2012); *see also White v. Harmon*, No. 94-1456, 1995 WL 518865, at *3 (6th Cir. Aug. 31, 1995) (holding it unreasonable for an officer with "virtually no canine-handling training" to bring a "little-trained" dog to the arrest scene "for no apparent reason").  Here, Ashford has produced no evidence that Ruger was not properly trained.

In short, Raby's decision to deploy Ruger did not violate clearly established law.

C.

*The Degree of Force:  Controlling Ruger During the Seizure.*  Finally, Ashford argues that Raby unreasonably prolonged the use of force, allowing Ruger to keep biting him even after he was subdued.  This argument requires a close look at what happened just after Ashford was pulled from the vehicle.

Here's Ashford's version of the events:  the officers grabbed both his arms the moment he hit the asphalt, leaving him "no longer in control of anything."  R. 18-2, Pg. ID 291.  Meanwhile, Ruger bit his arm a "dozen or so" times.  *Id.*  To Ashford, it felt like he "was being held down just specifically so this dog could continue to bite [him]."  *Id.*  How long did this go on?  In his deposition, Ashford said that he couldn't estimate the time.  In his appellate briefs, he now says it was about ten seconds after he was out of the vehicle.

But the videos belie Ashford's timing, as well as his suggestion that Raby gave Ruger free rein.  Here's what the footage shows:  once Ashford is out of the vehicle, Raby devotes his attention to controlling Ruger while the other officers focus on securing the suspect.  Raby gives Ruger the release command within a couple seconds of one officer securing Ashford's right arm—about four to five total seconds after Ashford is pulled from the vehicle.  Ashford stops screaming within the next second or two after that, showing that Ruger obeyed.

All in all, the footage shows that Raby's handling of Ruger during the seizure was responsible and professional.  At most, one could argue that Raby could have called the dog off a second or two sooner.  But that kind of fine-sliced judgment call amid "tense, uncertain, and rapidly evolving" circumstances just isn't the stuff of a Fourth Amendment violation.  *Graham*, 490 U.S. at 397; *see also Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010); *Dunn*, 549 F.3d at 354–55.

It definitely isn't the stuff of a *clearly established* violation.  Indeed, Ashford cites only two out-of-circuit cases to show that Raby should have known his use of force was unreasonably prolonged.  *See Edwards v. Shanley*, 666 F.3d 1289 (11th Cir. 2012); *Watkins v. City of Oakland*, 145 F.3d 1087 (9th Cir. 1998).  But as a threshold matter, our sister circuits' precedents are usually irrelevant to the "clearly established" inquiry.  The only exception is for "extraordinary" cases where out-of-circuit decisions "both point *unmistakably* to" a holding and are "*so clearly* foreshadowed by applicable direct authority as to leave *no doubt*" regarding that holding.  *Ohio Civil Serv. Emps. Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir. 1988) (emphases added); *accord Kanuszewski v. Mich. Dep't of Health & Human Servs.*, 927 F.3d 396, 415–16 (6th Cir. 2019); *Hearring v. Sliwowski*, 712 F.3d 275, 282 (6th Cir. 2013).

This general rule against out-of-circuit authority makes perfect sense.  Why?  Because at its heart, the "clearly established" requirement comes down to fair notice.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982).  Reasonable officers in this circuit will pay attention to this court's caselaw.  After all, that's the law that governs their actions.  But we can't expect officers to keep track of persuasive authority from every one of our sister circuits.  *See Kent v. Oakland Cty.*, 810 F.3d 384, 397 (6th Cir. 2016).  They spend their time trying to protect the public, not reading casebooks.

Here, neither of Ashford's two cases meets *Seiter*'s high standard.  In *Edwards*, the Eleventh Circuit denied qualified immunity after an officer ordered a *five-to-seven-minute* canine attack against a fully subdued suspect.  666 F.3d at 1296–98.  That's worlds apart from what happened to Ashford.

As for *Watkins*, the Ninth Circuit there denied immunity after finding it clearly established that "excessive duration of [a] bite" (in that case, up to thirty seconds) would be unreasonable. 145 F.3d at 1093; *see id.* at 1090. But the court failed to explain why it was clearly established that a thirty-second bite *was* excessive under the circumstances (as the correct analysis required). *Compare id.* at 1093, *with Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018). Thus, *Watkins* arguably made the all-too-common error of "defin[ing] clearly established law at a high level of generality." *Kisela*, 138 S. Ct. at 1152 (cleaned up); *see also Wesby*, 138 S. Ct. at 590. And besides, even overlooking that problem, a thirty-second bite is still far longer than the bite here.

In the end, nothing about Raby's use of Ruger to seize Ashford violated clearly established law. Thus, Raby is entitled to qualified immunity.

We affirm.