NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0388n.06

No. 22-5421

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 18, 2023
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ERIC TARTER, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| METROPOLITAN NASHVILLE AIRPORT | ) | ON APPEAL FROM THE |
| AUTHORITY, et al., | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| Defendants, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| SERGEANT DALTON ENGSTROM; | ) | |
| OFFICER JERRY LOVELL; OFFICER BRIAN | ) | OPINION |
| ROBBINS, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

Before: SILER, COLE, and NALBANDIAN, Circuit Judges.

NALBANDIAN, J., delivered the opinion of the court in which SILER, J., joined. COLE, J. (pp. 14–23), delivered a separate dissenting opinion.

**NALBANDIAN, Circuit Judge.** Metropolitan Nashville Airport Authority officers suspected that Eric Tarter presented a fraudulent credit card at the airport's Hertz rental car kiosk. Officers investigated. And, for part of that investigation, they handcuffed Tarter in the airport. But because nothing came of the investigation, they released him. After, Tarter filed suit under 42 U.S.C. § 1983 alleging constitutional violations stemming from the incident. The district court granted qualified immunity. Because the unlawfulness of the officers' actions was not clearly established, we affirm.

I.

For some time, credit card fraudsters have targeted rental car companies at the Nashville International Airport.  So much so that Hertz now trains its employees to run credit-card checks when they suspect potential fraud.  So when Eric Tarter presented a First Access credit card to Marlene Fernandez at the airport's Hertz kiosk, Fernandez ran a bank identification number ("BIN") search on the credit card.[1]  That search showed a "different bank than the one that was on the credit card."  (R. 66, ¶ 10 (citation omitted).)  Concerned, Fernandez notified the Metropolitan Nashville Airport Authority ("MNAA") Department of Public Safety ("DPS").

MNAA Officer Robbins, Officer Lovell, and Sergeant Engstrom ("the Officers") responded to Fernandez's call.  Fernandez provided Officer Robbins with Tarter's First Access credit card and driver's license.  One of the officers ran a license search in the Pennsylvania DMV system.  No results.  Next, Officer Lovell and Sergeant Engstrom ran BIN searches on the First Access credit card.  Again, the results revealed a different bank name from the one listed on the credit card.

With three BIN searches producing concerning results, the officers enlisted offsite officer Detective Brian Wolters.  Sergeant Engstrom texted Detective Wolters a picture of the results of his BIN search, followed by pictures of the First Access credit card and six other credit cards that Tarter voluntarily provided.  Detective Wolters ran BIN searches on Tarter's credit cards and found an inconsistency with a Macy's credit card.

---

[1] A BIN search involves inputting the first six digits of a credit card into a database that returns the name of the financial institution that issued the credit card and the credit card number.  The financial institution that appears in the database should match the name of the institution printed on the card.  If it does not, that's evidence of potential fraud.

About twenty minutes in, Sergeant Engstrom called dispatch and requested a status update on Tarter's license. Still no results. And a few minutes later, Detective Wolters called dispatch with the same request, to no avail.[2] So Wolters then requested a criminal history search. The search revealed Tarter's history of fraud crimes, including retail theft, forgery, identity theft, and providing false identity to law enforcement.

These new discoveries required further investigation. So Detective Wolters recommended handcuffing Tarter for everyone's safety. Sergeant Engstrom instructed Officer Lovell to place Tarter in handcuffs. Officer Lovell did, 42 minutes after the investigation began.

Once handcuffed, Officer Lovell and Sergeant Engstrom led Tarter away from the Hertz counter to another area in the terminal and placed him on a bench. Ultimately, the Officers verified the Macy's card and Tarter's identity via social media, but they couldn't verify the First Access card. At that point, the Officers released Tarter. In all, Tarter sat in handcuffs for about 26 minutes.

Tarter filed a complaint with DPS, challenging the Officers' use of handcuffs. An investigation ensued. As part of the investigation, Lieutenant Harding interviewed the Officers and Detective Wolters. An investigation report states: "Officer Lovell advised that in the past suspects involved in calls at the rental car counters have fought DPS personnel or ran from them. Officer Lovell therefore put Mr. Tarter in handcuffs. . . . Sgt. Engstrom further stated that he personally knows of cases where the fraud suspects would run or fight police when encountered." (R. 51-1, PageID 320, 322.) And Officer Robbins said similar things. In the end, the MNAA report concluded that "[n]o MNAA or DPS policy was violated." (*Id.* at PageID 323.)

---

[2] Tarter notes that the officers didn't receive any results from the Pennsylvania DMV system, which is different from receiving confirmation that there's no record of him.

Having no success with DPS, Tarter turned to federal court. He sued the Officers under 42 U.S.C. § 1983 and state law, alleging violations of his Fourth Amendment right against unreasonable seizures, false imprisonment, and battery.[3] Each party submitted motions for summary judgment. The district court granted the Officers' motion while denying Tarter's. The district court found: "The MNAA officers had a specific reason to believe Mr. Tarter was a flight risk: he was a fraud suspect based on his criminal history and the inconsistencies in his credit cards, and a recent MNAA email had warned that fraud suspects 'may flee' from law enforcement." (R. 72, Order, p. 9.) And it held that, "if the officers' use of handcuffs violated a constitutional right, that right was not clearly established." (*Id.*) Tarter timely appealed.

## II.

We review the district court's grant of summary judgment on qualified-immunity grounds de novo. *Simmonds v. Genesee County*, 682 F.3d 438, 444 (6th Cir. 2012). To defeat an assertion of qualified immunity at the summary judgment stage, a plaintiff "must present evidence sufficient to create a genuine issue as to whether the defendant committed the acts that violated the law." *Id.* (citation omitted).

In determining whether government officials are entitled to qualified immunity, we conduct a two-step inquiry. "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citation omitted). We can address these requirements in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

---

[3] Other counts were dismissed with prejudice. Tarter also sued Fernandez, but she was voluntarily dismissed. And he sued the MNAA but does not appeal the grant of summary judgment to the MNAA.

4

III.

Tarter makes three arguments on appeal. First, he argues that the district court didn't consider all facts and inferences in his favor when granting the Officers' motion for summary judgment. Second, he argues that the district court erred in finding that the Officers were entitled to qualified immunity on his unreasonable-seizure claim. Third, he argues that the district court erred in granting summary judgment on his state-law claims. We discuss each in turn.

A.

We first address Tarter's argument that the district court didn't consider all facts and inferences in his favor when granting the Officers' motion for summary judgment. In particular, he says that the district court inferred too much from an internal email from Lieutenant Harding to "DPS Supervisors" and Detective Wolters, sent a few days before the incident with Tarter. Harding wrote: "Det. Wolters and I have been speaking to Hertz/Dollar/Thrifty personnel this week during their annual fraud training. . . . I expect to see an uptick in calls to [Airport Communications] about suspicious IDs and suspects." (R. 58-14, PageID 581.) So Harding told these supervisors to remind officers in roll call that fraud suspects "may flee if they see a uniformed officer *approaching* and [the officers should] treat them accordingly as [they] would any person suspected of a felony crime." (*Id.* (emphasis added).) Tarter argues that it was improper for the district court to infer from this email that Officer Lovell and Sergeant Engstrom—the handcuffing officers—had reason to believe that fraud suspects would present a flight risk *after* an initial approach. And Tarter argues that it is not clear that the pair read this email, or received word of its contents.

But recall that Detective Wolters—who received the email and, according to the email, was involved with the annual fraud training—recommended that Lovell and Engstrom handcuff Tarter.

5

And even if we agree with Tarter that the district court read too much into this email, there are other undisputed facts in the record showing that Officer Lovell and Sergeant Engstrom had reason to believe that fraud suspects may flee at any time during an investigatory stop. The MNAA Investigation Report contains general statements from both officers that past suspects fled. (R. 51-1, Exhibit G, p. 3 ("Officer Lovell advised that in the past suspects involved in calls at the rental car counters have fought DPS personnel or ran from them."); *Id.* at p. 5 ("[Sergeant Engstrom] stated that he personally knows of cases where the fraud suspects would run or fight police when encountered.").) And declarations submitted by the two officers contain similar sentiments. (R. 62-3, Lovell Decl., PageID 606 ("[I]n the past, suspects had tried to flee law enforcement during similar investigations."); R. 62-4, Engstrom Decl., ¶ 3 ("When dealing with fraud cases, like the Tarter investigation, prior suspects had tried to flee or fight.").)[4] The district court's finding that the handcuffing officers had reason to believe that fraud suspects like Tarter could flee is supported by the record.

## B.

Next, we turn to the district court's finding that the Officers were entitled to qualified immunity.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Under *Terry v. Ohio*, 392 U.S. 1 (1968), "an officer may, consistent with the Fourth

---

[4] These statements do not conflict with the officers' deposition testimony about whether they felt that Tarter was a safety threat or flight risk. (R. 58-5, Engstrom Dep. Tr.17:3–7; R. 58-8, Lovell Dep. Tr. 15:8–10, 23:18–19.) And based on the record before us, Tarter's counsel didn't question Officer Lovell or Sergeant Engstrom about their knowledge of or experiences with former fraud suspects at their depositions. So the statements in these declarations are not barred by the sham affidavit rule. *See Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 907 (6th Cir. 2006) (allowing parties to submit affidavits that "fill[] a gap left open by the moving party"). Also, the statements in the declarations are consistent with the statements the two officers provided during the MNAA investigation, taken before Officer Lovell and Sergeant Engstrom's depositions.

Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). But a *Terry* stop that is supported by reasonable suspicion at the outset may nonetheless violate the Fourth Amendment if it is excessively intrusive in scope or manner of execution. *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993).

Because Tarter concedes that the Officers had a proper basis for the *Terry* stop, we focus on the second prong—whether the detention and investigation methods were too intrusive under the circumstances.[5] This inquiry asks "whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Garza*, 10 F.3d at 1245 (citation omitted). "If the manner in which an investigatory stop is conducted is unreasonable, the seizure then ripens into an arrest, which must be supported by probable cause." *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006).

Recall that, after 42 minutes of investigating, the Officers made several discoveries. The Officers suspected that Tarter possessed not just one, but two fraudulent credit cards. The Officers couldn't verify Tarter's driver's license. And the Officers learned of Tarter's checkered criminal history, which included many fraud crimes. The Officers had knowledge of or experience with past fraud suspects who fled. So as the Officers prepared to confront Tarter with these discoveries in a heavily-trafficked airport, they handcuffed Tarter and led him away from the Hertz counter to complete the investigation. Tarter argues that the handcuffs were unnecessary.

---

[5] A claim that investigative methods weren't reasonable is analytically distinct from an excessive force claim—which Tarter does not make. (Appellant Br. p. 37, n.3.) Having said that, at least one of our published cases cited the *Graham* factors when determining the reasonableness of the use of force within the framework that we use here. *See Dorsey v. Barber*, 517 F.3d 389, 399–400 (6th Cir. 2008).

But even if the Officers' use of handcuffs was unreasonable, Tarter "still can't recover unless its unreasonableness was 'clearly established at the time.'" *Ashford v. Raby*, 951 F.3d 798, 801 (6th Cir. 2020) (citation omitted). He needs to identify "precedent finding a Fourth Amendment violation in similar circumstances," or "failing that," he must "show that this is the rare obvious case in which no precedent is needed." *Id.* (cleaned up). Our analysis begins and ends with the clearly-established prong because Tarter hasn't identified on-point precedent or demonstrated that precedent wasn't needed in his case.

Start with the first path for the clearly-established prong—on-point precedent. This standard is "tough." *Id.* "[E]xisting precedent" at the time of the incident must "put the illegality of [the Officers'] conduct 'beyond debate.'" *Id.* (quoting *Wesby*, 138 S. Ct. at 589). So "existing precedent" must "'squarely govern[]' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (citation omitted). It is not enough that a rule is merely "suggested by then-existing precedent." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (per curiam). Specificity is critical; we cannot "define clearly established law at too high a level of generality." *Id.* "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (cleaned up).

Tarter cannot meet this demanding standard because he hasn't cited a case that puts the illegality of the handcuffing beyond debate. We'll go through the cases he cites to show why. First, Tarter relies on *Humphrey v. Mabry*, 482 F.3d 840 (6th Cir. 2007), for the general proposition that "it is unreasonable for officers to rely on information that has been disproven by their direct observations." (Appellant Br. at 22.) For the first 42 minutes of the investigation, he didn't flee;

so, he argues, it would be unreasonable to expect that he would. Setting aside that he cites from the dissent in *Humphrey*, (*see id.* (citing *Humphrey*, 482 F.3d at 855 (Clay, J., dissenting))), general statements do not produce clearly established law. *See Kisela*, 138 S. Ct. at 1153.

And regardless, this general statement stems from a legal principle that doesn't apply to Tarter. That is, officers cannot detain suspects longer than reasonably necessary. Once their suspicion is dispelled, the detention should end (and force is unjustified). *See Brown v. Lewis*, 779 F.3d 401, 416 (6th Cir. 2015). So when officers use force *after* it becomes apparent that a suspect is not committing a crime, or that officers have the wrong suspect, that use of force is unreasonable. *See id.*; *Humphrey*, 482 F.3d at 847. Here, Tarter agrees that the Officers had reasonable suspicion throughout the investigation—and the record shows that their suspicions intensified over time.

And for that same reason, our circumstances stand in stark contrast to another one of Tarter's cases, *Fisher v. Harden*. *See* 398 F.3d 837 (6th Cir. 2005). In *Fisher*, officers responded to a false tip that "a man had his feet tied to the railroad tracks" and was possibly suicidal. *Id.* at 839–40. The tipster stood about 250 yards from Fisher, who was actually a 77-year-old farmer seated on a folding chair shooting groundhogs. *Id.* at 839. Two officers, also far away, instructed Fisher to come toward them, eventually pointing their guns at Fisher when they realized he was armed. *Id.* at 840. Fisher dropped his gun and walked toward them. *Id.* "After he finally reached them, the officers commanded Fisher, still at gunpoint, to lay face down on the roadway, and handcuffed him behind his back." *Id.* Every action that Fisher took before these detention methods dispelled the notion that he would commit suicide—and so the officers lost probable cause *before* their commands to get on the ground and their use of handcuffs. *Id.* at 843.[6] So the officers'

---

[6] "[O]fficers detaining an individual believed to be suicidal must have 'probable cause to believe that the person is dangerous to himself or others.'" *Id.* (citation omitted).

9

methods were unreasonable. Also, to state the obvious, *Fisher* isn't about flight or fraud, it's a probable-cause case, and the officers there used far more intrusive methods than ours did here.

Next, Tarter argues that "the law clearly establishes that a detainee's own actions *must* form the basis for a specific belief that they present a flight risk." (Appellant Br. at 24 (emphasis added).) Again, general propositions divined from precedent do not produce clearly established law. *See Kisela*, 138 S. Ct. at 1153.[7]

Even so, Tarter cites cases that establish that suspects *can* pose a flight risk if their behavior suggests that they would flee.[8] And to put officers on notice, Fourth Amendment violations must be more than just "suggested by then-existing precedent." *See Bond*, 142 S. Ct. at 11.

Tarter's reliance on *Bennett v. City of Eastpointe* fares no better. *See* 410 F.3d 810 (6th Cir. 2005). *Bennett* involved several incidents where the Eastpointe Police Department stopped young bicycle riders. Tarter points to one instance where officers stopped youths who were double-riding away from a store that they were suspected of "'casing' . . . with the intent to abscond with unattended bicycles." *Id.* at 834. The officers patted down and handcuffed the youths, and placed the youths in the back of a cruiser. *Id.* at 835. We found the use of handcuffs (and all investigatory measures) unreasonable because "the officers had no reasonable belief that

---

[7] Tarter also relies on *Brown* for the related proposition that "[i]ntrusive measures are warranted to secure a detainee only where specific facts" or "reason[s]" "lead to an inference that the detainee poses a risk of flight or of violence." 779 F.3d at 415. But that is also too generalized. *See Kisela*, 138 S. Ct. at 1153.

[8] *See United States v. Caruthers*, 458 F.3d 459, 468 (6th Cir. 2006) ("Given that [the suspect] had already demonstrated that he was a flight risk, it was reasonable for [the] Officer . . . to take steps to avert another attempted escape [by placing the suspect in a police car]."); *United States v. Jacob*, 377 F.3d 573, 579 (6th Cir. 2004) (holding that it was reasonable for officers to draw their weapons to prevent an escape when the suspects' vehicle "lunged forward as if they were attempting to escape"); *Feathers v. Aey*, 319 F.3d 843, 846, 852 (6th Cir. 2003) (reasoning that a suspect's motions "gave the officers sufficient reason to believe that he was fleeing" so it was reasonable to "grab[]" him and "pin[] him . . . against a pillar").

the youths were armed and dangerous . . . [and] they have alleged no facts that would indicate that the youths attempted to flee or do anything else that would warrant this use of force." *Id.* at 837.

*Bennett* is not like this case. The officers in *Bennett* used more invasive measures where there was very little in the way of reasonable suspicion. And the officers in *Bennett* did not even try to justify their investigatory methods. They didn't "attempt to assert that they had any belief, let alone a reasonable one, that the youths were armed and dangerous," nor did they "assert that [flight] was a concern." *Id.* at 835, 840. In fact, there wasn't "one single fact" that supported the officers' use of any invasive method of detention—handcuffs or otherwise—based on their stated concern for "officer safety." *Id.* at 835–37, 840. The panel scolded the Eastpointe Police Department for what amounted to a string of questionable stops with discriminate treatment based on race. *Id.* at 835, 841.

Here, the Officers do attempt to justify their belief, tied to several undisputed facts, that Tarter might flee and present a safety risk. Unlike *Bennett*, where police concerns were likely dispelled after a pat-down (at the latest), the Officers here grew increasingly suspicious. They struggled to identify Tarter, located another troubling credit card, and learned of his past fraud crimes. The Officers had knowledge of or experience with past fraud suspects who fled. They thought things could escalate. All agree that a fraud suspect fleeing in an airport would pose a safety concern. So as the Officers prepared to confront Tarter with these discoveries in a heavily-trafficked airport, they handcuffed Tarter and led him away from the Hertz counter to complete the investigation.

We save for another day whether a "degree of intrusion" such as this "was reasonably related in scope to the situation at hand." *Garza*, 10 F.3d at 1245 (citation omitted). Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law."

*Wesby*, 138 S. Ct. at 589 (citation omitted). And because Tarter did not carry his burden to show that "existing precedent 'squarely governs' the specific facts at issue," *Kisela*, 138 S. Ct. at 1153 (citation omitted), it protects the Officers here.[9]

And for the second path—the obvious-case exception—it is far from obvious that the Officers violated Tarter's constitutional rights. The Officers handcuffed Tarter and placed him on a bench for about 26 minutes. He once complained that the handcuffs were tight, and the Officers explained how he should adjust himself to remove any discomfort. Sure, this encounter may have

---

[9] Tarter cites several out-of-circuit cases. "[A]s a threshold matter, our sister circuits' precedents are usually irrelevant to the 'clearly established' inquiry." *Ashford*, 951 F.3d at 804. "The only exception is for extraordinary cases where out-of-circuit decisions both point unmistakably to a holding and are so clearly foreshadowed by applicable direct authority as to leave no doubt regarding that holding." *Id.* (cleaned up). Tarter's cases do not meet our high standard. In fact, the cases that Tarter relies on involve circumstances that are "worlds apart from what happened to [Tarter]." *Id.*; *see Turner v. Driver*, 848 F.3d 687, 683, 693–94 (5th Cir. 2017) (finding it unreasonable to handcuff a person videotaping a police station from a public sidewalk after the person refused to provide identification); *United States v. Bailey*, 743 F.3d 322, 339–41 (2d Cir. 2014) (finding it unreasonable to handcuff a drug-trafficking suspect after a pat down revealed no weapons); *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 455, 458 (8th Cir. 2011) (finding it unreasonable to "immediately place[]" a theft-by-swindle suspect "in handcuffs, *without making any investigation*" (emphasis added)); *Cortez v. McCauley*, 478 F.3d 1108, 1130–31 (10th Cir. 2007) (finding an officer's methods unreasonable where a plaintiff "was never the target of the investigation" and an officer "escort[ed] her from her bedroom in the middle of the night and ke[pt] her in a locked patrol car for nearly an hour"); *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1306 (11th Cir. 2006) (finding it unreasonable to handcuff an elementary school student after "[t]he incident was over" to "impress upon her the serious nature of committing crimes"); *Washington v. Lambert*, 98 F.3d 1181, 1184, 1189–90 (9th Cir. 1996) (finding it unreasonable for officers to "point[] their guns" at two men, handcuff them, and place them in separate police cars when the "only basis for linking [the suspects] to the supermarket robberies was the purported *general similarity* of their physical characteristics to those of the actual suspects"). And Tarter cites *Hatrim v. Las Vegas Metro Police Dep't*, 603 F. App'x 588 (9th Cir. 2013), but "a plaintiff cannot point to unpublished decisions to meet [the] burden" of showing that a right is clearly established. *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022). That leaves us with *United States v. Acosta-Colon*, which is closer to the circumstances before us. 157 F.3d 9 (1st Cir. 1998). But, as Tarter notes, there needs to be a "robust consensus of cases of persuasive authority" to make a right clearly established. *Ortega v. U.S. Immigr. & Customs Enf't*, 737 F.3d 435, 439 (6th Cir. 2013) (citation omitted). One case doesn't do the trick.

been embarrassing.  But the facts here are far from egregious.  *Cf. Taylor v. Riojas*, 141 S. Ct. 52, 54 (2020).

For these reasons, the district court correctly determined that the Officers are entitled to qualified immunity.

## C.

Finally, Tarter argues that, because the Officers are not entitled to qualified immunity on his § 1983 claim, "the district court erred in granting summary judgment on [his] related state-law claims" for false imprisonment and battery (which he characterizes as an unlawful arrest claim). (Appellant. Br, p. 37, n.3.)  But because he doesn't brief any reason why these claims should proceed independent of his federal law claims, we find that summary judgment is appropriate.

**AFFIRMED**.

**COLE, Circuit Judge, dissenting.** The officers violated Eric Tarter's clearly established Fourth Amendment rights when they handcuffed him 42 minutes into a *Terry* stop during which Tarter was calm, cooperative, and gave the officers no reason to believe he posed a flight or safety risk. Given this, I would reverse the grant of summary judgment on the grounds of qualified immunity to Officer Lovell, Officer Robbins, and Sergeant Engstrom and remand for further proceedings. I respectfully dissent.

## I. BACKGROUND

I begin by highlighting a few additional facts from the record. First, the additional BIN checks performed by Lovell and Engstrom when they arrived at the Hertz counter merely confirmed the information that prompted Fernandez's initial call to the Metro Nashville Airport Authority (MNAA). All three of these BIN checks related only to the First Access card.

Second, the officers attempted to verify Tarter's identity by running his Pennsylvania driver's license number, but the officers did not receive a response from the Pennsylvania DMV regarding Tarter's license. To be clear, the officers received *no communication* at all from the Pennsylvania DMV during the investigation—in fact, officers believed that the Pennsylvania system was "probably down during this period." (Lovell Dep. Excerpt, R. 51-5, PageID 368.)

Third, Tarter voluntarily provided the officers with several pieces of information throughout the investigation, including six additional credit cards and his social security number to facilitate the criminal history check. Though the criminal history report returned information involving fraud-related arrests, most of the charges listed were dismissed. Notably, the report also included Tarter's age, weight, height, date of birth, hair color, eye color, and listed a neck tattoo as an identifying feature. The report's identifying information, however, was not used to confirm Tarter's identity.

Finally, when reflecting on the encounter, Robbins agreed that Tarter was cooperative at all times. Engstrom described Tarter's demeanor as calm and confirmed that while "anyone can be a safety threat," he did not feel that Tarter specifically posed a flight or safety risk. (Engstrom Dep. Excerpt, R. 58-5, PageID 518–19.) Lovell agreed, indicating that while "[a]ny suspect potentially poses a safety risk," Tarter specifically posed neither a safety nor a flight risk. (Lovell Dep. Excerpt, R. 58-8, PageID 546–47.)

With these additional facts in mind, I proceed to the analysis.

## II.  ANALYSIS

We review de novo a district court's grant of summary judgment. *Brown v. Lewis*, 779 F.3d 401, 410 (6th Cir. 2015). "Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). The court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in their favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).[1]

We also review a qualified immunity determination de novo. *Sterling Hotels, LLC v. McKay*, 71 F.4th 463, 466 (6th Cir. 2023). "Qualified immunity protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known." *Brown*, 779 F.3d at 411 (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)). To overcome an assertion of qualified immunity, a plaintiff must show both (1) that the

---

[1] The majority opinion discusses Tarter's argument regarding the district court's interpretation of the MNAA email separately. Because appellate review of both summary judgment and qualified immunity is de novo, and inferences must be drawn in Tarter's favor when considering the officers' motion for summary judgment, discussion of the evidence occurs in the discussion of the qualified immunity analysis below.

government officials violated the plaintiff's statutory or constitutional rights; and (2) that the rights were clearly established. *Id.* at 411–12.

## A. Constitutional Violation

Under the Fourth Amendment, "[a]n officer may detain an individual for a short time for investigatory purposes if, under the totality of the circumstances, he has 'reasonable suspicion,' that is, 'a particularized and objective basis for suspecting the particular person . . . of criminal activity based on specific and articulable facts.'" *Id.* at 412 (quoting *Hoover v. Walsh*, 682 F.3d 481, 494 (6th Cir. 2012)); *see also Terry v. Ohio*, 392 U.S. 1, 88 (1968). Tarter does not contest that the officers had reasonable suspicion for the initial stop.

But when conducting a *Terry* stop, officers' actions should be no "more intrusive than necessary to effectuate an investigative detention otherwise authorized by the *Terry* line of cases," meaning that "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500, 504 (1983). "If 'the length and manner' of the stop, including any force used, are not 'reasonably related to the basis for the initial intrusion,' then the stop ripens into an arrest, for which the officers must show probable cause." *Brown*, 779 F.3d at 412 (quoting *Houston v. Clark Cnty. Sheriff Deputy John Does 1–5*, 174 F.3d 809, 814 (6th Cir. 1999)). Further, "intrusive measures are warranted to secure a detainee only where specific facts lead to an inference that the detainee poses a risk of flight or of violence to the officers." *Id.* at 415.

The use of handcuffs is one example of an "intrusive measure." *Id.*; *see also Muehler v. Mena*, 544 U.S. 93, 103 (2005) (Kennedy, J., concurring) ("The use of handcuffs is the use of force, and such force must be objectively reasonable under the circumstances."). Though the use of handcuffs during a *Terry* stop does not per se transform the stop into an arrest, "the Fourth

Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case." *Bennett v. City of Eastpointe,* 410 F.3d 810, 836 (6th Cir. 2005); *Houston*, 174 F.3d at 815.

Our circuit has repeatedly addressed the use of handcuffs during a *Terry* stop. In doing so, we have determined that the use of handcuffs during a *Terry* stop is reasonable when a detained individual (1) admits to having a weapon, *O'Malley v. City of Flint*, 652 F.3d 662, 670 (6th Cir. 2011); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 309 (6th Cir. 2005); (2) exhibits nervous or aggressive behavior warranting a belief of dangerousness, *United States v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007); (3) attempts to flee, *United States v. Jacob*, 377 F.3d 573, 579–80 (6th Cir. 2004); *see also Feathers v. Aey*, 319 F.3d 843, 851–52 (6th Cir. 2003); *United States v. Caruthers*, 458 F.3d 459, 468 (6th Cir. 2006); or (4) is allegedly involved in a crime closely associated with violence or danger, *Radvansky*, 395 F.3d at 309; *United States v. Foster*, 376 F.3d 577, 587–88 (6th Cir. 2004); *United States v. Hurst*, 228 F.3d 751, 758 n.3 (6th Cir. 2000).

In contrast, we have found that the use of handcuffs was unreasonable when the detained individuals gave officers no reason to believe they were armed, dangerous, a flight risk, or involved in a crime generally associated with violence. For example, in *Bennett*, we found that the officers' use of handcuffs on detained youths was inappropriate. 410 F.3d at 835–37. We explained that "[i]n addition to . . . ha[ving] no reasonable belief that the youths were armed and dangerous, [the officers] . . . alleged no facts that would indicate that the youths attempted to flee or do anything else that would warrant this use of force." *Id.* at 837. While it is true that the officers in *Bennett* also conducted an unlawful pat-down prior to their use of handcuffs, the pat-down search was not the only reason that the use of the handcuffs was unlawful. Rather, we specifically noted the absence of any indication that the detained individuals posed a flight risk.

17

Similarly, in *Brown v. Lewis*, we determined that the methods used during an investigative stop, including the use of handcuffs, were unreasonably intrusive. 779 F.3d at 414. In *Brown*, the officers pulled over Brown's car, forced her out of it onto the ground, and handcuffed her for about ten minutes. *Id.* In finding these actions unconstitutional, the court explained that Brown "did not give the officers any reason to believe that she was dangerous or involved in criminal activity; [and] she was compliant with officer instructions throughout the stop." *Id.* The court specifically noted that "[i]f there is no specific reason for the officers to believe that *the detainee* poses a risk of flight or violence, 'a bare inference' or speculation . . . is not sufficient to justify the use of handcuffs." *Id.* at 415 (emphasis added).

Tarter's case is more similar to *Brown* and *Bennett* than it is to cases where the use of handcuffs was deemed reasonable. First, Tarter was detained for suspected credit card fraud and there is no suggestion in the record that this is a crime generally associated with violence or weapons. The record also lacks any facts suggesting that the officers believed Tarter was armed or observed him displaying nervous, erratic, or aggressive behavior. Indeed, the opposite is true: Robbins described Tarter as cooperative throughout the encounter, and Lovell and Engstrom confirmed that Tarter was calm, and at no point did they believe him to be a flight or safety risk.

Instead, the officers believed that the use of handcuffs was reasonable based on their past experience with fraud suspects, the additional inconsistency with Tarter's Macy's card, and the information contained in the criminal history report. As for the officers' past experiences, none of our case law permitted officers to rely on a generalized statement based on past experience to justify the use of handcuffs during a *Terry* stop, particularly in light of personal observations by the officers that gave no indication that further force was required to continue the detention.

18

As to Tarter's criminal history, this too was insufficient to warrant the use of handcuffs. While the report may have contained past fraud-related arrests, most of the charges in the report were dismissed. Additionally, it is not clear why this information gave the officers reason to believe that Tarter posed a flight or safety risk *in that moment*. Finally, it seems incongruous for the officers to attribute the report's criminal history to Tarter and use this information as a justification for the use of more intrusive measures while simultaneously claiming that they remained unable to confirm his identity (which was a primary reason for his continued detention).

Finally, as for the additional card inconsistency, this is the same concern that precipitated the initial stop. Tarter remained calm and cooperative as the investigation continued, and the record contains no facts that permit the inference that Tarter's behavior might have changed. Even taking these reasons together, it is difficult to see why the use of handcuffs would be reasonable. While each piece of information may provide a reason to continue the investigation into Tarter, there is nothing to suggest that more intrusive measures were required to do so.

Because the officers were not presented with "specific facts lead[ing] to an inference that [Tarter] pose[d] a risk of flight or of violence to the officers," the use of handcuffs was unreasonable under the circumstances and violated Tarter's Fourth Amendment rights. *Brown*, 779 F.3d at 415.

**B. Clearly Established**

To overcome an assertion of qualified immunity, Tarter must also demonstrate that the right in question was clearly established. *Brown*, 779 F.3d at 411. Under Supreme Court precedent, "[c]learly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2019) (cleaned up); *Hope v. Pelzer*,

536 U.S. 730, 739 (2002). While this is a demanding standard, the Court has also made clear that it "does not require a case directly on point" for a right to be clearly established. *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam). In fact, the Court has "firmly rejected the notion that 'an official action is protected by qualified immunity unless the very action in question has previously been held unlawful.'" *Brosseau v. Haugen*, 543 U.S. 194, 205 (2004) (Stevens, J., dissenting) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Rather, "[b]ecause the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau*, 543 U.S. at 198 (per curiam). Generally, "a body of relevant case law" can provide an answer regarding the reasonableness of an officer's conduct, and thus whether the right in question was clearly established. *Wesby*, 583 U.S. at 64.

Here, this body of case law exists and establishes that the officers' use of handcuffs on Tarter was unreasonable, as is evident by the discussion above. Numerous published Sixth Circuit cases make clear that intrusive measures like the use of handcuffs during a *Terry* stop are appropriate "only where specific facts lead to an inference that the detainee poses a risk of flight or of violence to the officers." *Brown*, 779 F.3d at 415. And here, no such facts existed.

Further, this right is not overly broad or defined at a high level of generality. The high-level right in question is the Fourth Amendment right to be free from unreasonable seizures. Had Tarter framed the violation in this way, his case would be difficult to make. But here, the right in question is much more specific: the right of a compliant, non-aggressive, non-fleeing individual to be free from handcuffing during an investigation of a suspected non-violent offense. And the case law explains clearly when the use of handcuffs is and is not appropriate during a *Terry* stop. Here, it was not. *See Brown*, 779 F.3d at 414–15; *Bennett*, 410 F.3d at 836–37.

20

Moreover, several other circuits have similarly articulated that in order to constitutionally use handcuffs during an investigative detention, officers must believe that the detained individual poses a risk of flight or violence, or was detained in connection with a crime generally associated with violence or weapons. *See United States v. Bailey*, 743 F.3d 322, 340 (2d Cir. 2014) (explaining that while handcuffs do not transform a detention into an arrest, officers must "have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat" and that the officers presented no information that Bailey "pose[d] a *present* physical threat or flight risk warranting handcuffing" (emphasis added)); *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457–58 (8th Cir. 2011) (explaining that the use of handcuffs violated the Fourth Amendment when (1) there were no facts suggesting the detained person was armed or dangerous; (2) the person was not detained for a violent crime; and (3) the person was calm and cooperative during the stop and acted neither erratically nor suspiciously); *United States v. Acosta-Colon*, 157 F.3d 9, 19 (1st Cir. 1998) (determining that the use of handcuffs was unreasonable when none of the suspects were "being uncooperative, belligerent, or showed any perceptible inclination to put up resistance or become violent" and the officers failed to present evidence that they held "an actual suspicion that [the detained individual] was armed or otherwise presented an appreciable danger"); *Washington v. Lambert*, 98 F.3d 1181, 1192 (9th Cir. 1996) (noting that it was "clearly established that if the *Terry*-stop suspects are cooperative and the officers do not have specific information that they are armed or specific information linking them to a recent or inchoate dangerous crime," the use of intrusive measures including handcuffs was unwarranted).

What is more, Scott Harding, an MNAA lieutenant who assisted in the investigation into Tarter and conducted the internal investigation of the officers following Tarter's complaint,

21

articulated the precise right in question, indicating that officers were in fact "on notice" of the governing standard. When deposed on behalf of the MNAA, Harding was questioned about the use of handcuffs during investigative detentions. Harding recalled his training from the "academy" and explained that an officer might use handcuffs during a *Terry* stop "[i]f the officer has specific facts known to them that would feel like the person in question would flee or fight or even the nature of the–and/or the nature of the crime[.]" (Harding 30(b)(6) Dep. Excerpt, R. 66-3, PageID 704.) Given that Harding explained the governing standard nearly verbatim, it is reasonable to conclude that officers were "on notice" of the right and should have recognized that the use of handcuffs on Tarter contravened a clearly established constitutional right.

In sum, the case law at the time of Tarter's detention clearly established that absent a specific belief that Tarter posed a safety or flight risk, or was detained in connection with a crime closely associated with violence or danger, it was unlawful for officers to use handcuffs during an investigative detention.

## C. Individual Officers

Finally, liability under § 1983 must be assessed as to each officer individually based on their own actions. *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015); *Dorsey v. Barber*, 517 F.3d 389, 399 n.4 (6th Cir. 2008).

Lovell arrived on the scene at the beginning of the investigation, was present throughout, and was the officer who placed the handcuffs on Tarter. Under governing case law, Lovell was on notice that the use of handcuffs in these circumstances violated Tarter's clearly established right and can be held liable under § 1983 for his actions.

Engstrom is liable under a theory of supervisory liability because he instructed Lovell to handcuff Tarter. Engstrom was on the scene from the outset of the investigation and observed

Tarter throughout. By instructing Lovell to handcuff Tarter, Engstrom "authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bennett*, 410 F.3d at 818 (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)).

Finally, Robbins is liable for failure to intervene. Robbins was also present throughout the investigation. He observed Tarter during the investigation and was the officer who assisted Tarter when he complained that the handcuffs were too tight. Because Robbins "(1) observed or had reason to know that [the constitutional harm] would be or was being used, and (2) had both the opportunity and the means to prevent the harm from occurring," he can be held liable for failure to intervene. *Sheffey v. City of Covington*, 564 F. App'x 783, 793 (6th Cir. 2014) (cleaned up); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). So, Lovell, Engstrom, and Robbins all took actions that support liability under § 1983.

**D. State Law Claims**

The disposition of Tarter's state law claims turned on the grant of qualified immunity for the federal allegations. But because the defendants are not shielded by qualified immunity on the federal claims, I would also remand the state law claims for further consideration.

## III. CONCLUSION

For the foregoing reasons, I would reverse the district court's grant of summary judgment to the defendants and remand for further proceedings. I respectfully dissent.