NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0402n.06

Case No. 22-1182

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Sep 12, 2023
DEBORAH S. HUNT, Clerk

DARRELL A. SIGGERS,

    Plaintiff-Appellee,

v.

JOSEPH ALEX,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF
MICHIGAN

OPINION

Before: SILER, BUSH, and READLER, Circuit Judges.

BUSH, J., delivered the opinion of the court in which READLER, J., joined. SILER, J. (pp. 13–15), delivered a separate opinion concurring in part and dissenting in part.

JOHN K. BUSH, Circuit Judge. The Due Process Clause of the Fourteenth Amendment charges the states with certain duties to ensure "'justice shall be done' in all criminal prosecutions." *Cone v. Bell*, 556 U.S. 449, 451 (2009) (quoting *United States v. Agurs*, 427 U.S. 97, 111 (1976)). For Darrell Siggers, that justice was delayed. After serving thirty-four years of his life sentence, the government discovered new evidence that cast significant doubt on the validity of Siggers's first-degree murder conviction. The government moved to vacate Siggers's conviction, and he was released from prison in 2018.

Shortly after his release, Siggers sued Joseph Alex, a former police officer, for several alleged constitutional violations related to his conviction under 42 U.S.C. § 1983. Alex moved for summary judgment on qualified immunity and preclusion grounds, which the district court granted

in part and denied in part. As relevant for appeal, Alex argues that no federal case had clearly established by 1984 that he had an obligation to disclose certain materials under *Brady v. Maryland*, 373 U.S. 83 (1963), and that Siggers's suit is precluded by his prior state and federal post-conviction proceedings. We affirm in part and reverse in part.

## I.

On February 16, 1984, James Montgomery was shot and killed in Detroit, Michigan.[1] That evening, Christine Arnold hosted a party that Montgomery and Siggers attended, along with Ranard Jackson, Derek Lawson, Toby Red, and three other people. According to Siggers, Montgomery and Red got into a scuffle at the party. But that scuffle took a turn when Montgomery attacked Red with a straight razor. Red then ran away from the party, shouting, "I'll be back; I got something for your ass." Soon after, Montgomery, Jackson, and Lawson left the party but, before they got far, someone emerged from between two houses and fired a rifle at them. Montgomery was killed, and Jackson and Lawson fled. The next day, Jackson spoke with police and identified Siggers as the shooter, which Lawson later corroborated. Siggers was arrested, and the investigation continued.

During the investigation, Alex interviewed Jack Fuqua and Gary Kelly, two neighbors who lived close to Arnold and the shooting. While being interviewed by Alex, Fuqua recounted the following story. Shortly after the shooting, Red entered his home with a rifle and told him that he "just shot a mother-f***** for starting some s*** at [Arnold's] house." Fuqua described Red as "real light. About 5'6"/7", something like that. Wasn't too tall."[2] After hearing this, Alex told

---

[1] Alex argues on appeal that the district court mistakenly identified clearly established law, so we may "simply take, as given, the facts that the district court assumed when it denied summary judgment for that (purely legal) reason." *Johnson v. Jones*, 515 U.S. 304, 319 (1995). And Alex must concede the most favorable view of the facts to Siggers because this is an interlocutory appeal. *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998).

[2] Siggers, by contrast, is described by counsel as a "dark-skinned African-American man."

Fuqua to "forget" about Red, and that Fuqua "was not to tell anyone about Toby Red." If he did, Alex threatened to "make sure [he] went back to prison." Alex never disclosed Fuqua's statements or his threat.

Kelly told Alex a different story. He said that after Montgomery was murdered, he saw a white man walking around with a long gun and thought that it was his neighbor, Roy Garland. Alex interviewed Garland and eliminated him as a suspect, but he never disclosed this information or Kelly's statement.

Several months after his arrest, Siggers was convicted of first-degree murder and possession of a firearm in the commission of a felony, and he was sentenced to life imprisonment. According to Alex, Siggers's conviction was based on mainly these facts: (1) two eye-witness identifications of Siggers as the shooter and (2) testimony by Claude Houseworth, an employee of the Detroit Police Department who testified, as an expert witness in firearms identification, that shell casings linked to Siggers, and shell casings found after Montgomery's murder, were fired from the same gun.

Over the next couple of decades, Siggers challenged his conviction several times in state and federal court. Every challenge failed. But in 2018, a firearms expert authored a report demonstrating that Houseworth's testimony was, simply put, "wholly inaccurate." The prosecutor's office agreed: "we think a different result [in Siggers's trial] would have been probable without th[e] [Houseworth] evidence." So, with the prosecutor's approval, a Michigan state court vacated Siggers's conviction.

A newly freed man, Siggers filed this suit under 42 U.S.C. § 1983 alleging several constitutional violations by Houseworth and Alex in connection with his conviction.[3] Alex moved

---

[3] Houseworth is deceased. His estate is not involved in this appeal.

for summary judgment based on collateral estoppel or, in the alternative, qualified immunity. He contended that Siggers's claims were all barred by prior state and federal post-conviction proceedings, and that, even if collateral estoppel is inapplicable, he violated no clearly established federal right and is therefore entitled to qualified immunity.

The district court largely granted Alex's request, and the only remaining claim is that Alex violated Siggers's Fourteenth Amendment right to due process by withholding Kelly's and Fuqua's respective statements and related information. In so finding, the district court held that federal and state habeas decisions do not retain preclusive effect after the underlying conviction has been vacated.

This interlocutory appeal followed.[4]  First, Alex contests the district court's denial of qualified immunity. Second, he argues that the district court erred by rejecting his claim that Siggers's suit is barred by collateral estoppel.

## II.

We begin by examining our jurisdiction over both issues. As to the first, our precedent is clear that we can review the district court's denial of qualified immunity to Alex. *See Leary v. Livingston Cnty.*, 528 F.3d 438, 441–42 (6th Cir. 2008). Though the denial of qualified immunity is not strictly final, qualified immunity is "an immunity from suit" that is effectively unreviewable

---

[4] There is an issue of whether Alex's notice of appeal was timely. The Federal Rules of Appellate Procedure set the time to file an appeal whenever a party moves for reconsideration of a final order. Fed. R. App. P. 4(a)(4)(A). But the denial of qualified immunity is not technically a final order as defined by Federal Rule of Civil Procedure 59(e) or 60(b). After this case was argued, another panel of our Court evaluated this technical wrinkle in a separate proceeding. We concluded that "if the underlying order would have been appealable under the collateral order doctrine before a timely motion for reconsideration was filed, it is still appealable after the district court disposes of the motion." *Salter v. City of Detroit*, No. 22-1656 at *4 (6th Cir. June 21, 2023). The district court filed its opinion and order granting in part and denying in part Alex's motion for summary judgment on September 24, 2021. Alex timely moved for reconsideration on October 8, 2021, which the district court denied on February 16, 2022. Following our decision in *Salter*, Alex had thirty days from February 16, 2022 to file his notice of appeal, which he satisfied by filing on March 7, 2022.

on appeal from a final judgment, so we treat the denial as final under the collateral order doctrine. *Plumhoff v. Rickard*, 572 U.S. 765, 771–72 (2014) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The second prong of qualified immunity, clearly established law, is a "pure issue of law" that does not depend on contested issues of fact. *Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2006).

As to the second issue, collateral estoppel, our jurisdiction is not so clear. The collateral-order doctrine authorizes appellate-court jurisdiction over a "narrow and selective" category of issues. *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 113 (2009) (quoting *Will v. Hallock*, 546 U.S. 345, 350 (2006)). Interlocutory decisions are treated as final under the collateral-order doctrine only when they involve a "conclusive" decision on an important issue separate from the merits that is "effectively unreviewable" on appeal from a final judgment. *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995). We determine the applicability of the collateral-order doctrine "for the entire category to which a claim belongs," *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1992), bearing in mind the Supreme Court's admonition that this narrow exception "never be allowed to swallow the general rule that a party is entitled to a single appeal." *Id.* (citations omitted).

Though the district court's rejection of Alex's collateral-estoppel argument may be "conclusive," it is far from unreviewable. To be "effectively unreviewable," an issue generally must involve "an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial." *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495, 498–99 (1989) (quoting *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799 (1989)). Collateral estoppel serves the interests of judicial economy, finality, and consistency. *See Montana v. United States*, 440 U.S. 147, 153–54 (1979). Yet, unlike qualified immunity, the entire value of this doctrine is not

irretrievably lost if Alex must await a final judgment. After all, if the district court erroneously rejected Alex's preclusion argument, then we could simply reverse the final decision on appeal. True, this may imperfectly remedy any legal error, but that alone is not enough to justify categorically extending our jurisdiction beyond the strong limits of 28 U.S.C. § 1291. *See Digit. Equip.*, 511 U.S. at 868, 872; *Will*, 546 U.S. at 354–55 (explaining that a typical res judicata/claim preclusion defense does not warrant immediate appeal under the collateral order doctrine). We thus determine that the collateral-order doctrine does not authorize us to consider issues of collateral estoppel.

But even when we lack jurisdiction under the collateral-order doctrine, we can exercise our pendent appellate jurisdiction over non-appealable issues which are "inextricably intertwined" with appealable issues. *See Williams v. Maurer*, 9 F.4th 416, 428 (6th Cir. 2021). This authority is discretionary, and we exercise it only when "[o]ur finding on the first issue necessarily and unavoidably decides the second." *See Brennan v. Twp. of Northville*, 78 F.3d 1152, 1158 (6th Cir. 1996). In the context of qualified-immunity appeals, many legal issues could be categorized as "inextricably intertwined" with the qualified-immunity issue. After all, if claims are precluded, then plaintiffs cannot state a claim for a constitutional violation, and thus cannot overcome qualified immunity. *See Peterson v. Heymes*, 931 F.3d 546, 553–54 (6th Cir. 2019); *see also Roberson v. Torres*, 770 F.3d 398, 402–03 (6th Cir. 2014).[5] Yet this circular analysis threatens to

[5] In both *Roberson* and *Peterson*, the panel relied either explicitly or implicitly on the Supreme Court's authorization of appellate jurisdiction over "abstract issues of law" in the context of interlocutory qualified-immunity appeals. *Roberson*, 770 F.3d at 402 (quoting *Johnson v. Jones*, 515 U.S. 304, 317 (1995)); *see also Peterson*, 931 F.3d at 553 (citing *Roberson*, 770 F.3d at 403). Yet the Supreme Court never endorsed appellate review for any issue of law that could be tacked onto a qualified immunity appeal. *See Johnson*, 515 U.S. at 319 (describing the difference between reviewable determinations "that a given set of facts violates clearly established law" and unreviewable issues of fact). This reading is bolstered by *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), which authorized review from a district court's denial of qualified immunity "to the extent that it turns on an issue of law." In this case, the district court's denial of qualified immunity and rejection of Alex's collateral estoppel arguments were two separate legal

expand or contract our jurisdiction based on a party's finesse in characterizing the nature of the issue(s) appealed. *See Digit. Equip. Corp.*, 511 U.S. at 872. We decline to set § 1291 aside so easily.

Ultimately, we disagree with Alex that issues of preclusion are immediately appealable. The preclusive effect of federal or state post-conviction proceedings does not affect the status of clearly established law in 1984. And our review of whether the district court improperly denied Alex qualified immunity does not "necessarily and unavoidably" resolve whether Siggers's claims are precluded. *See Summers v. Leis*, 368 F.3d 881, 889 (6th Cir. 2004) (quoting *Vakilian v. Shaw*, 335 F.3d 509, 521 (6th Cir. 2003)). Thus, we decline to exercise jurisdiction over Alex's collateral-estoppel appeal.

### III.

With our jurisdiction confined, we now turn to the standard of review. We review de novo the district court's denial of summary judgment based on qualified immunity. *Quigley v. Thai*, 707 F.3d 675, 679 (6th Cir. 2013). And in doing so, we consider the facts in the light most favorable to Siggers. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014); *see Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998).

Qualified immunity is designed to balance the need to hold government officials accountable for constitutional wrongdoing with the substantial costs of discouraging public officials from discharging their duties for fear of being sued. *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987). We strike this balance by providing immunity from civil damages for all public officials unless their conduct violated a "clearly established statutory or constitutional right[] of

---

determinations. Indeed, the district court denied Alex's claim of qualified immunity based largely on its interpretation of clearly established law, not state and federal preclusion.

which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This standard protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

On appeal, Alex does not dispute that his conduct conceivably violated Siggers's Fourteenth Amendment right to due process. *See Brady*, 373 U.S. at 87**.** Rather, his argument focuses on the lack of clarity of the law at the time of the violation; namely, that even if the Kelly and Fuqua information might constitute *Brady* material today, that point was not clearly established by 1984. Thus, he argues, he is entitled to qualified immunity and reversal of the district court.

A right is clearly established if, at the time of the challenged conduct, it was "sufficiently clear [such] that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up). Though we do not require a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. The touchpoint for this inquiry is whether the defendant had fair warning his conduct was unconstitutional. *See Hope v. Pelzer*, 536 U.S. 730, 739–40 (2002). So, in instances "where a general constitutional rule applies with 'obvious clarity' to a particular case, factually similar decisional law is not required to defeat a claim of qualified immunity." *Smith v. Cupp*, 430 F.3d 766, 777 (6th Cir. 2005) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

In evaluating the state of the law in 1984—the time in question for this appeal—we consider Supreme Court and Sixth Circuit precedent. *Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999). In limited circumstances, we may consider out-of-circuit decisions as well, but

these decisions must be "so clearly foreshadowed by applicable direct authority" that there can be no doubt of their holding. *Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020) (quoting *Ohio Civ. Serv. Emps. Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir. 1988)).

With the stage set, we start by asking what *Brady* obligations a police officer had as of 1984. In 1963, the Supreme Court first held that prosecutors have an affirmative duty to disclose material exculpatory evidence to criminal defendants. *Brady*, 373 U.S. at 87. By 1984, this circuit and others had extended that disclosure obligation to police officers as well. *See Jackson v. City of Cleveland*, 925 F.3d 793, 823 (6th Cir. 2019) (collecting cases); *Hilliard v. Williams*, 516 F.2d 1344, 1349 (6th Cir. 1975), *vacated*, 424 U.S. 961 (1976), *aff'd in relevant part*, 540 F.2d 220, 222 (6th Cir. 1976). Alex does not seriously dispute that it was clearly established by 1984 that he had an obligation to disclose *Brady* evidence to the prosecution. But he argues *Brady* established only a general obligation too broad to clearly establish that either the Kelly or the Fuqua information had to be disclosed. We disagree with respect to the Fuqua statement and threat but agree with respect to the Kelly material.

Consider first the facts of *Brady v. Maryland* itself. Facing a charge of murder in the first degree, Brady requested extrajudicial statements made by his codefendant. *Brady*, 373 U.S. at 84. Though Brady received several statements, the prosecution failed to disclose his co-defendant's statement in which he "admitted the actual homicide." *Id.* Drawing on a line of cases that broadly outlined the state's obligation not to secure a defendant's conviction through deception, the Supreme Court concluded that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or punishment." *Id.* at 87. This requirement avoids "an unfair trial to the accused," and ensures that criminal defendants have access to evidence which would "tend to exculpate" them. *Id.* at 87–88.

Compare those facts to the facts here. According to Siggers, Fuqua disclosed to Alex that shortly after the shooting, Red entered his home with a rifle and confessed that he "just shot a mother-f***** for starting some s*** at [Arnold's] house." In response, Alex threatened Fuqua with jail time if he ever disclosed that statement to anyone else. To be sure, this scenario has some factual distinctions from *Brady*, but officers "can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741; *see also id.* at 753–54 (Thomas, J., dissenting) ("Certain actions so obviously run afoul of the law that an assertion of qualified immunity may be overcome even though court decisions have yet to address materially similar conduct." (cleaned up)). This is such a case as it pertains to the Fuqua-related evidence. As the facts are alleged by Siggers, the Fourteenth Amendment violation is clear; it is implausible that Alex had inadequate notice from *Brady* that deliberately concealing a confession constituted unlawful conduct. *See Brady*, 373 U.S. at 86 ("deliberate suppression" of evidence favorable to the criminal defendant violates the Federal Constitution (quoting *Pyle v. Kansas*, 317 U.S. 213, 215–216 (1942))); *see also Hysler v. Florida*, 315 U.S. 411, 412–13 (1942). Thus, the district court rightly denied Alex's motion for summary judgment to the extent that Siggers's claim relies on Fuqua's statement and the threat that Alex made to him.

But the same cannot be said for Alex's failure to disclose the Kelly statement and the exclusion of Garland as a suspect. Siggers argues that it was clearly established by 1984 that evidence of a legitimate alternative suspect is "favorable" under *Brady* and thus had to be disclosed.[6] Though we agree as a general matter, Siggers conflates the Fuqua and Kelly

---

[6] Siggers spends much of his brief arguing that police officers had a clearly established obligation to disclose *Brady* material. Though we agree with Siggers on this point, that does not end our inquiry, as we must also assure ourselves that a reasonable officer in Alex's position in 1984 would have known that certain information was material and exculpatory under *Brady*. *See, e.g.*, *McMillian v. Johnson*, 88 F.3d 1554, 1569 (11th Cir. 1996).

information in formulating his standard. *Brady* provided ample notice that Alex had an obligation to disclose the Fuqua statement and threat but not the Kelly information. From *Brady* alone, it certainly was not obvious that a statement implicating someone who was cleared as a suspect of the crime, but who might have been mistaken for a second suspect, was *Brady* material. And Siggers identifies no pre-1984 case from the Sixth Circuit or Supreme Court, and we cannot find one, that clearly establishes that point.

To be sure, with the benefit of hindsight, it is conceivable that the Kelly evidence could have supported Siggers's theory of Red as an alternative suspect. But had Alex consulted precedent before acting in 1984, he would have found no caselaw that put the issue of whether to disclose the Kelly statement and exclusion of Garland as a suspect "beyond debate." *Ashcroft*, 563 U.S. at 741. *Carrillo v. County of Los Angeles* does not alter the calculus. 798 F.3d 1210 (9th Cir. 2015). This out-of-circuit case found that, by 1984, it was clearly established that police officers violate a criminal defendant's Fourteenth Amendment right to due process by withholding evidence of alternative suspects. *Id.* at 1224–25. But while we agree that *Brady* fairly implies that some evidence of alternative suspects must be disclosed, *Carrillo* does not define alternative suspect evidence, nor is its conclusion "so clearly foreshadowed by applicable direct authority" that there can be no doubt as to its holding. *Seiter*, 858 F.2d at 1177. We disagree that *Brady* clearly established a general right as of 1984 to all evidence of alternative suspects.[7] Therefore,

---

[7] In his separate opinion, Judge Siler relies primarily on *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) to argue that it was clearly established as of 1984 that Alex needed to turn over the Kelly evidence under *Brady*. As relevant here, *Moldowan* involved whether a *Brady* obligation was clearly established as of the date of the crime in that case (in 1990) for police to disclose evidence of four men seen standing near an assault victim who lay on the ground, one of whom kicked the victim and two of whom claimed involvement in the crime. *See id.* at 382. Even assuming *Moldowan* accurately reflects the status of the law interpreting *Brady* as of 1984, *Moldowan* is distinguishable from facts here that pertain to whether a disclosure obligation for the Kelly information was clearly established. There was no evidence in *Moldowan* that the police investigation had eliminated any of the undisclosed persons as suspects, as there was here with respect to the suspect, Garland, who was referenced in the Kelly material.

we find that Alex is entitled to qualified immunity for failing to turn over the Kelly statement to the prosecution.

## IV.

The district court did not err by denying Alex's motion for summary judgment as to the Fuqua statement on qualified immunity grounds but did err by denying qualified immunity as to the Kelly information. Thus, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

**SILER, Circuit Judge, concurring in part and dissenting in part.** I respectfully disagree with some of the majority's conclusions on the jurisdictional and merits issues presented. I would find that we have jurisdiction to consider Alex's collateral estoppel defense and that clearly established law informed Alex that *Brady* required disclosure of both the Fuqua and Kelly evidence.

This court previously addressed in two published decisions whether we had jurisdiction over a collateral estoppel defense on an interlocutory appeal from the denial of qualified immunity, and in both cases, we answered in the affirmative. *Peterson v. Heymes*, 931 F.3d 546, 553 (6th Cir. 2019); *Roberson v. Torres*, 770 F.3d 398, 401–03 (6th Cir. 2014). We primarily held as such because collateral estoppel is a question of law, rather than fact. *See Peterson*, 931 F.3d at 553; *Roberson*, 770 F.3d at 402–03. We further acknowledged in *Peterson* that "[a]bsent allegations of a coerced confession, [the plaintiff] cannot overcome qualified immunity." 931 F.3d at 554.

The same is true here. Determining whether all of Siggers's claims are barred by collateral estoppel is a question of law for the court to decide. And despite the majority's assertion that the district court's rejection of both defenses involved "two separate legal determinations," our resolution of the collateral estoppel defense necessarily impacts the qualified immunity analysis because, if the claims are barred, Siggers cannot establish a violation of a constitutional right.[1] While the majority finds the analysis in *Peterson* and *Roberson* to be "circular," "[a] panel of this court may not overturn binding precedent because a published prior panel decision remains

---

[1] By not addressing the collateral estoppel defense now, Alex would effectively lose the benefit of his qualified immunity defense if the court later determines after final judgment that collateral estoppel applies, because then, Siggers would be unable to establish a constitutional violation. Thus, Alex would be subject to the "harassment, distraction, and liability" of trial rather than receiving the potential protection of qualified immunity now, which directly contravenes the Supreme Court's mandate "of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) (citation omitted).

controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision."[2] *United States v. Elbe*, 774 F.3d 885, 891 (6th Cir. 2014) (internal quotation marks and citation omitted). Accordingly, I would hold that we have jurisdiction to address Alex's collateral estoppel defense. I would also adopt a similar analysis as the district court and hold that such a defense fails under these circumstances. Only by addressing the collateral estoppel defense can the court properly consider the viability of Alex's qualified immunity defense.

As to the merits, I agree with the majority that clearly established law informed Alex of his obligation to disclose the Fuqua evidence; however, I would also affirm the district court's denial of qualified immunity as to the Kelly statements. The majority reviews each alleged violation in isolation; however, we "evaluate the material effect of exculpatory evidence by examining the evidence collectively, not item-by-item." *United States v. Frost*, 125 F.3d 346, 383 (6th Cir. 1997). Taking the facts in the light most favorable to Siggers as we must, Alex was on sufficient notice that withholding the Kelly evidence—evidence of which, as Siggers contends, lends further

---

[2] The majority attempts to distinguish this matter from *Peterson* and *Roberson* by reasoning that "[t]he preclusive effect of federal or state post-conviction proceedings does not affect the status of clearly established law in 1984." While this may be true for the majority's conclusion as to the Kelly statements, by affirming the district court's denial of qualified immunity as to the Fuqua statements and threat, it necessarily must conclude that Alex violated Siggers's constitutional rights under *Brady*. The majority does not explain why it lacks jurisdiction to fully address Alex's defense over this issue and yet simultaneously reach the merits of Siggers's claim. This is especially apparent as Alex concedes that, without the collateral estoppel defense and taking the facts in the light most favorable to Siggers, Siggers has established a constitutional violation—that was clearly established—with respect to the Fuqua threat, rendering the majority's analysis on this issue otherwise unnecessary.

credibility to Red being a legitimate, alternative suspect when considered collectively with the Fuqua evidence—was a *Brady* violation.[3]

In *Moldowan v. City of Warren*, which dealt with allegations of similar exculpatory evidence, we acknowledged that "[d]ecisions from other circuits recognizing the type of '*Brady*-derived' claims that Moldowan asserts here date back as far as 1964." 578 F.3d 351, 382 (6th Cir. 2009) (citation omitted). While this language could be read as addressing only the issue of whether a police officer had a duty to disclose material exculpatory evidence, we still had to conclude that the claims at issue "implicate[d] a clearly established constitutional right," which we found that they did. *Id.* And even if this binding precedent's conclusions do not compel the outcome here, at least four other circuits similarly held that, by 1984, this "type of *Brady*-derived" evidence must be disclosed. *Id.* (internal quotation marks and citation omitted); *see also Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1224–26 (9th Cir. 2015); *Jackson v. Wainwright*, 390 F.2d 288, 298 (5th Cir. 1968); *Barbee v. Warden*, 331 F.2d 842, 844–46 (4th Cir. 1964); *United States ex rel. Meers v. Wilkins*, 326 F.2d 135, 138 (2d Cir. 1964). Thus, Alex was sufficiently on notice of his obligation to disclose both the Kelly and Fuqua evidence, and I would affirm, in full, the district court's denial of qualified immunity.

---

[3] The majority affirms the district court as to the "Fuqua statement" yet only analyzes whether Alex had a duty to disclose Red's confession to Fuqua. However, Fuqua also described Red to Alex as "real light." The district court found that Alex was not entitled to qualified immunity as to this description, in addition to the other Fuqua evidence. The majority's silence on this issue is amplified when considered next to Kelly's statement that he saw a "white guy" carrying a rifle after the murder. Despite the similarity in the two statements, the majority does not explain why it affirms the denial of qualified immunity as to one but not the other.